UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHNATHAN JOHNSON,

                                    Plaintiff,

                                                        9:14-CV-0803
v.                                                      (BKS/TWD)

JEFF MCKAY, GAIL HAPONIK,
DR. CARL KOENIGSMANN,
JOSEPH BELLINIER,
MAUREEN E. BOLL, BRIAN FISCHER,
DAVID ROCK, THEODORE ZERNIAK,
DONALD UHLER,

                                    Defendants.
_____

APPEARANCES:                              OF COUNSEL:

JOHNATHAN JOHNSON
89-A-1042
Plaintiff pro se
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

HON. ERIC T. SCHNEIDERMAN             RYAN L. BELKA, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

        This pro se prisoner civil rights action, commenced by Plaintiff Johnathan Johnson

pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the

Honorable Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).[1]

In his original Complaint (Dkt. No. 5), Plaintiff claimed that Defendants Jeff McKay, Gail Haponik, Dr. Carl Koenigsmann, Joseph Bellnier, Maureen E. Boll, Brian Fischer, David Rock, Theodore Zerniak, and Donald Uhler: (1) denied him access to the courts by depriving him of paper, mail, outside communications and access to the prison law library; and (2) denied him videotapes for and access to inmate grievance procedures. *Id*. Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 2.)

This Court recommended that Defendants' motion to dismiss be granted, and that Plaintiff be granted leave to amend his claim regarding access to the courts and denied leave to amend his claims regarding access to the inmate grievance program. *Johnson v. McKay*, No. 9:14-CV-0803 (BSK/TWD), 2015 WL 1735102, at * 11, 2015 U.S. Dist. LEXIS 50817, at * 14 (N.D.N.Y. April 16, 2015).[2] Judge Sannes approved and adopted this Court's Report-

_____

[1] Plaintiff is a frequent litigator who is barred from proceeding *in forma pauperis* in federal court absent a showing of an exception to the "three strikes" rule in the Prison Litigation Reform Act of 1996. 42 U.S.C. §1997e(a). *See Johnson v. Adams*, No. 10 Civ. 1082 (DNH/DEP), 2012 WL 3052957, 2012 U.S. Dist. LEXIS 104723 (N.D.N.Y. July 5, 2012) (recounting Plaintiff's litigation history); *Johnson v. McKay*, No. 9:14-CV-0803 (BSK/TWD), 2015 WL 1735102, at * 4 n.2, 2015 U.S. Dist. LEXIS 50014, at * 10 n.2 (N.D.N.Y. April 16, 2015) (identifying cases filed in the Northern District of New York from 2007 to 2013). This action was commenced in the New York State Supreme Court, County of Franklin and removed to the United States District Court for the Northern District of New York by Defendants on July 2, 2014. (Dkt. No. 1.) Plaintiff's motion to remand was denied by the Hon. Gary L. Sharpe, Chief United States District Judge, by Decision and Order dated December 9, 2014. (Dkt. No. 17.)

[2] The Court will provide Plaintiff with copies of unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Recommendation and ordered the dismissal with prejudice of Plaintiff's claim for denial of

evidence for and access to grievance procedures, and the dismissal without prejudice of

Plaintiff's denial of access to the courts claim. *Johnson v. McKay*, 2015 WL 1735102, at * 6,

2015 U.S. Dist. LEXIS 50014, at 14 (N.D.N.Y. April 16, 2015).

Plaintiff filed a notice of interlocutory appeal to the Second Circuit on April 23, 2015

(Dkt. No. 22), and an Amended Complaint against the same Defendants on April 24, 2015. (Dkt.

No. 24.) In his Amended Complaint, Plaintiff has asserted claims for: (1) denial of his First

Amendment right to access to the courts, specifically the Appellate Division, Third Department

and the New York State Court of Claims; and (2) retaliation for filing lawsuits and inmate

grievance complaints.[3] *Id*. Defendants have now filed a Rule 12(b)(6) motion to dismiss

Plaintiffs' Amended Complaint. (Dkt. No. 26.) For the reasons that follow, the Court

recommends that Defendants' motion to dismiss be granted.

## II.    PLAINTIFF'S AMENDED COMPLAINT

### A.    Access to the Courts

Plaintiff alleges in his Amended Complaint that Defendants Donald Uhler ("Uhler"),

former Deputy Superintendent at Upstate Correctional Facility ("Upstate"), and Theodore

Zerniak ("Zerniak"), a Corrections Captain at Upstate, "authorized depriving [Plaintiff] of access

---

[3] Plaintiff included the retaliation claim in his Amended Complaint despite the ordering
language in Judge Sannes' Memorandum-Decision and Order authorizing Plaintiff to file an
Amended Complaint "limited to his claim for denial of access to the courts, to plausibly suggest
that he suffered an actual injury." *Johnson v. McKay*, 2015 WL 1735102, at * 6. Because the
Plaintiff's Amended Complaint can be liberally construed to allege that some of the retaliatory
acts were undertaken to deny him access to the courts, the Court has construed the retaliation
claim to be within the scope of the grant of leave for purposes of Defendants' Rule 12(b)(6)
motion.

to . . . correspondence privileges of personal correspondence and privileged correspondence . . . during the years of 2010-thru 2013" and thus "refused to permit [Plaintiff] to petition the courts for grievance etc."  (Dkt. No. 24 at 4-6.)  Plaintiff claims they did so through the issuance of "paper" deprivation orders under DOCCS Directive 4933, § 305.2, N.Y. Comp.Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 305.2, which violated Plaintiff's right under Directive 4933, § 304.13, 7 N.Y.C.R.R. § 304.13, to send and receive regular and privileged correspondence.  *Id*. at 6-7.

Plaintiff alleges in conclusory fashion that Defendants Jeff McKay ("McKay"), Gail Haponik ("Haponick"), Joseph Bellnier ("Bellnier"), Maureen Boll ("Boll"), and Brian Fischer ("Fischer") implemented and enforced Uhler and Zerniak's unconstitutional issuance of deprivation orders, thereby depriving him of "access to the courts, law library, grievance proceedings, outside communication and <u>ALL</u> inside communication," including communication with Defendants David Rock ("Rock") and Fischer.  *Id*. at 6.

Plaintiff also claims that on October 3, 2011, Uhler had all of the documents regarding Plaintiff's litigation pending in the Appellate Division, Third Department confiscated from his cell.  *Id*. at 7.  Uhler allegedly refused to return the state court litigation documents resulting in dismissal by the Third Department of pending cases challenging conditions at Upstate from 2010 to 2013.  *Id.* at 7.  Plaintiff contends that he "had to deny Court of Claims appearance from 2010-thru 2013 due to the depriving [him] of 'ALL' his lawsuits in State Court and to date."  *Id* at 7-8.

### B.   Retaliation

Plaintiff alleges in his Amended Complaint that Uhler and Zerniak placed him on paper deprivation orders in retaliation for his filing of inmate grievances and federal and state lawsuits

during the period 2010 through 2013.  *Id*. at 5-6.  Plaintiff further claims that the "prison guards

retaliated against Johnson in eleven and Eight Building, and alleged that Johnson, had papers

covering cell lights, doors, windows, etc. and subsequently, Johnson pending lawsuits,

documents, Article 78 petition(s), Court of Claims documents, Federal Court's document would

taking from Johnson's cell." *Id*. at 5.

### III.     LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint "for failure to state a claim upon which

relief can be granted" under Rule 12(b)(6).  The motion tests the formal legal sufficiency of the

complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which

requires that a complaint include "a short and plain statement of the claim showing that the

pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972).  Satisfaction of

the requirement that a plaintiff "show" that he or she is entitled to relief requires that the

complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim

for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . .

[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged    but it has not shown    that the pleader is entitled to

relief." *Iqbal,* 556 U.S. at 679  (internal citation and punctuation omitted).

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there

are not "enough facts to state a claim that is plausible on its face." *Twombley*.  550 U.S. at 570.

5

While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe pro se complaints liberally even after *Twombly*).

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted).

## IV.    ANALYSIS

### A.    Present Status of the District Court's Jurisdiction Over the Action

Although neither party has raised the issue, because Plaintiff has a pending interlocutory appeal to the Second Circuit from the decision granting the motion to dismiss his original Complaint, the Court must consider whether the district court has been divested of jurisdiction by the appeal.

Normally, the docketing of a notice of appeal will divest the district court of jurisdiction over the issues presented in the appeal. *Retirement Bd. of the Policemen's Annuity and Ben. Fund of the City of Chicago v. The Bank of New York Mellon*, 775 F.3d 154, 158 n.3 (2 Cir. 2014) (citing *Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58 (1982)). "The divestiture of jurisdiction rule is, however, not a per se rule." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996). "It is a judicially crafted rule rooted in the interest of judicial economy, designed to avoid confusion or waste of time resulting from having the same issues before two courts at the same time." *Id.* (citation and internal quotation marks omitted). Therefore, "its application is guided by concerns of efficiency and is not automatic." *Id*.

The Second Circuit has ruled that a notice of appeal from a non-final order of the district court did not divest the jurisdiction of the district court. *See Leonhard v. United States*, 633 F.2d 599, 610 (2d Cir. 1980) ("we see no efficiency to be gained by allowing a party arbitrarily to halt the district court proceedings by filing a plainly unauthorized notice which confers on this Court the power to do nothing but dismiss the appeal."). In fact, in *Leonhard*, the Circuit Court found retention of jurisdiction in the district court under those circumstances to be "the preferable

7

view." *Leonhard*, 633 F.2d at 610. This Court agrees and finds that the district court has

jurisdiction over the case and the power to determine Defendants' motion to dismiss Plaintiff's

Amended Complaint despite Plaintiff's interlocutory appeal.

### B. Personal Involvement

Defendants move to dismiss the complaint on the grounds that Plaintiff fails to

adequately allege the personal involvement of any Defendant. (Dkt. No. 26 at 5.) Plaintiff

claims his Amended Complaint addresses all of the listed Defendants. (Dkt. No. 28 at 4.)

Under Second Circuit precedent, "personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v.*

*Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885

(2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a Plaintiff

must show some "tangible connection" between the unlawful conduct and the Defendant. *Bass*

*v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere

linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of

respondeat superior) is insufficient to show his or her personal involvement in that unlawful

conduct. *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431,

435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210

(2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely

because they held positions of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)

(citations omitted). Rather, supervisory personnel may be considered personally involved if they:

(1) directly participated in the violation; (2) failed to remedy that violation after learning of it

through a report or appeal; (3) created, or allowed to continue, a policy or custom under which

the violation occurred;  (4) had been grossly negligent in managing subordinates who caused the violation;  or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted)[4].

### 1.    Uhler and Zerniak

The factual allegations in Plaintiff's Amended Complaint regarding Defendants Uhler and Zerniak's issuance of paper deprivation orders and Uhler's removal of legal papers from Plaintiff's cell are adequate to make a plausible showing of personal involvement by those two defendants under the first *Colon* category.  (Dkt. No. 24 at 5-7.)

### 2.    McKay, Haponik, Bellnier, Boll, Rock, and Fischer

Plaintiff has alleged in his Amended Complaint that Defendants McKay, Haponik, Bellnier, Boll, Rock, and Fischer implemented and enforced the unconstitutional paper deprivation orders issued by Uhler and Zerniak under Directive 4933, which resulted in Plaintiff's denial of access to the courts.  *Id*. at 6.  This plausibly suggests, although barely, that

---

[4]  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies.  The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories.  Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories.  *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases).  The Second Circuit itself has noted that "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*."  *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012).  The Second Circuit declined to address the issue in *Reynolds*, however.  In *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013), the Second Circuit stated that "[*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but again declined to address the issue because it was not adequately pled in the complaint and has not addressed it since that time.  The Court will assume for the purposes of this motion that *Colon* remains good law.

these Defendants directly participated in the alleged violation of Plaintiff's constitutional rights under the first *Colon* factor.

### C.    Access to Courts

Plaintiff alleges that he was denied access to the courts as a result of being deprived of paper by all of the Defendants with the exception of Rock and having his legal materials removed from his cell by Uhler.  (Dkt. No. 24 at 5-7.)  "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)).  To state a claim for denial of access to the courts, a Plaintiff must allege facts that plausibly suggest: "(1) a 'nonfrivolous, arguable underlying claim' that has been frustrated by the defendants' actions, and (2) a continued inability to obtain the relief sought by the underlying claim." *Arar v. Ashcroft*, 585 F.3d 559, 592 (2d Cir. 2009) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415-16 (2002)).

As the District Court noted in dismissing Plaintiff's original Complaint for failure to state a claim:

> "[T]he right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415.  In other words, plaintiff must demonstrate an "actual injury" by showing that his underlying claim was nonfrivolous. *Lewis v. Casey*, 518 U.S. 343, 351-353 [ ] (1996) (reasoning that the "actual injury" requirement means that inmates "must demonstrate that a nonfrivolous legal claim ha[s] been frustrated or was being impeded.") "It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint." *Harbury*, 536 U.S. at 415.  Ultimately, "the complaint

should state the underlying claim in accordance with Federal Rule
of Civil Procedure 8(a), just as if it were being independently
pursued." *Id*. at 417.

*Johnson v. McKay*, 2015 WL 1735102, at * 3.

The District Court found that Plaintiff had failed to state any facts suggesting what

underlying claims or causes of action were allegedly frustrated by Defendants. *Id*. at * 4.

Finding Plaintiff's claim that he sustained injury because he lost his appeals in State court to be

entirely conclusory, the District Court concluded that Plaintiff had failed to state a plausible

claim for denial of access to the courts because the original Complaint alleged no facts

suggesting an actual injury. *Id*.

Although Plaintiff was granted leave to file an amended complaint with respect to his

access to the courts claim "to plausibly suggest that he suffered an actual injury," *Johnson v.*

*McKay*, 2015 WL 1735102, at * 6, his Amended Complaint fares no better than his original

Complaint in that regard. Plaintiff has not described the underlying claims and causes of action

in the Appellate Division Third Department and New York State Court of Claims, or claims he

has been prevented from pursuing in litigation because of the alleged denial of access to the

courts. (Dkt. No. 24.) In addition, Plaintiff has again failed to allege facts plausibly showing that

the actions of the Defendants have any bearing whatsoever on his losses in State court.

Therefore, the Court recommends that Plaintiff's First Amendment denial of access to the courts

claim be dismissed.

### D.      Retaliation

Plaintiff has added a claim for retaliation against Defendants in his Amended Complaint.

(Dkt. No. 24.) According to Plaintiff, during the years 2010 through 2013, he filed inmate

grievances against prison employees, nurses, and prison guards at Upstate, and he filed lawsuits in Federal and State court. (Dkt. No. 4 at 5.) Plaintiff claims that the deprivation orders issued by Defendants Uhler and Zerniak during those years, which deprived him of the ability communicate with the courts, were issued in retaliation for the filing of lawsuits and grievances against all of the Defendants and other prison employees. *Id*. at 5. Plaintiff further claims that Uhler had Plaintiff's legal papers relating to matters pending in the Third Department confiscated from his cell in retaliation for the lawsuits Plaintiff had filed. *Id*. at 7. In addition, Plaintiff has alleged generally that "the prison guards retaliated against Johnson" after he filed grievances against prison employees, nurses and prison guards.[5] *Id*.

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009); *see also Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)). "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381 (internal quotation marks omitted).

An inmate bears the burden of showing that "the protected conduct was a substantial or

---

[5] Plaintiff has not identified the prison guards who allegedly retaliated against him, nor has he named any prison guards as defendants. (See Dkt. No. 24 at 1-3, 5.) The Court has therefore disregarded Plaintiff's claim against the non-defendant prison guards.

motivating factor" in a defendant's decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro v. Gillespie*, 791 F.Supp. 2d 353, 371 (S.D.N.Y. 2011).

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz*, 534 U.S. at 508. As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because

> virtually any adverse action taken against a prisoner by a prison official
> even those otherwise not rising to the level of a constitutional
> violation can be characterized as a constitutionally proscribed
> retaliatory act.

*Dawes,* 239 F.3d at 491. Accordingly, claims of retaliation must be supported by specific facts; conclusory statements are not sufficient. *Flaherty*, 713 F.2d at 13.

Plaintiff alleges that Uhler and Zerniak retaliated against him for filing lawsuits and grievance against all of the Defendants and other prison personnel over the years. (Dkt. No. 24 at 5.) The filing of lawsuits and grievances is protected conduct for purposes of First Amendment retaliation claims. *See Colon*, 58 F.3d at 872; *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). Therefore, the allegations in Plaintiff Amended Complaint plausibly show that Plaintiff was engaged in protected conduct.

Plaintiff has alleged that Uhler and Zerniak's retaliatory issuance of paper deprivation orders denied him the ability to pursue litigation pending in the Third Department and Court of Claims. (Dkt. No. 26 at 5-8.) The Court finds that impeding or preventing an inmate from pursuing constitutionally protected state court litigation in retaliation for the filing of lawsuits could constitute adverse action for purposes of a retaliation claim. Furthermore, Courts have held that theft, confiscation, or destruction of an inmate's legal documents can constitute an adverse action for purposes of a retaliation claim. *See, e.g., Smith v. City of New York*, No. 03 Civ. 7576 (NRB), 2005 WL 1026551, at *3, 2005 U.S. Dist. LEXIS 7903, at *10 (S.D.N.Y. May 3, 2005) (retaliatory destruction of prisoner's legal documents appears designed to deter plaintiff's exercise of constitutional rights and constitutes adverse action for purposes of a retaliation claim).

However, Plaintiff has failed to make a plausible showing that Uhler and Zerniak's adverse actions against him were causally connected to his exercise of protected First Amendment rights. Plaintiff's conclusory assertion that Uhler and Zerniak retaliated against him for filing lawsuits against all of the Defendants and filing grievances during the period 2010 through 2013 lacks the specificity required to state a claim for retaliation. *See Flaherty*, 713 F.2d at 13 (retaliation claims must be supported by specific facts).

Plaintiff's Amended Complaint is devoid of specific facts regarding the content of the deprivation orders allegedly issued by Uhler and Zerniak, when the orders were issued, and the facts and circumstances surrounding issuance of the orders. Plaintiff's Amended Complaint is likewise devoid of specific facts regarding the lawsuits he relies upon as protected conduct for his retaliation claim    the defendants in each, the claims asserted, when they were commenced, the status or outcome, and the temporal proximity between lawsuits in which Uhler and Zerniak were named as defendants and their issuance of deprivation letters or Uhler's removal of Plaintiff's legal  papers.[6]

---

[6] As a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party. *See, e.g.*, *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about an incident involving another corrections officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at 18, 2014 U.S. Dist. LEXIS 120709, at * 49 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro,* 791 F. Supp. 2d at 369 (failure by plaintiff to provide any basis to believe corrections counselor would retaliate for a grievance in which she was not personally named); *Ciaprazi v. Goord*, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at * 8-9, 2005 U.S. Dist. LEXIS 38232, at * 22 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicate the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary hearing). There is no logical basis for concluding that it would be any less difficult

Because Plaintiff has failed to make a plausible factual showing of causation in his Amended Complaint, the Court recommends that his retaliation claim against Uhler and Zerniak be dismissed.

### E.    Leave to Amend

As noted above, a claim in a pro se complaint should not be dismissed without granting leave to amend at least once where the complaint, read liberally, gives some indication that a valid claim might be stated. *Cuoco,* 222 F.3d at 112. The District Court has already allowed Plaintiff an opportunity to amend his access to the courts claim. *See Johnson v. McKay*, 2015 WL 1735102, at * 6. Judge Sannes clearly explained in her Decision granting leave that "[t]o state a claim for denial of access to the courts, plaintiff must plead the underlying claim and facts to plausibly suggest that it is not frivolous." *Id*. at 4. Plaintiff has failed to do so in his Amended Complaint. Given Plaintiff's obvious disregard of Judge Sannes' clear analysis of the deficiencies in his original Complaint and his continued failure in his Amended Complaint to plead specific facts regarding the underlying legal claims and facts in the lawsuits at issue, the Court is disinclined to recommend that the District Court afford Plaintiff another opportunity to amend his access to the courts claim against the Defendants. Therefore, the Court recommends that Plaintiff's First Amendment access to the courts claim be dismissed with prejudice as against all of the Defendants.

However, because Plaintiff's retaliation claim against Uhler and Zerniak is asserted for the first time in his Amended Complaint, and it is not entirely clear that Plaintiff will be unable

---

to establish that a lawsuit against another party or parties would give a defendant cause to retaliate.

to assert a valid retaliation claim against one or both of those Defendants, the Court recommends that Plaintiff's retaliation claim against Uhler and Zerniak be dismissed without prejudice, and that Plaintiff be granted leave to file a Second Amended Complaint limited to his retaliation claim against those two Defendants.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion to dismiss Plaintiff's Amended Complaint for failure to state a claim (Dkt. No. 26) be **GRANTED**; and it is further

**RECOMMENDED** that the dismissal of Plaintiff's access to the courts claim as against all of the Defendants be dismissed with prejudice; and Plaintiff's retaliation claim against Uhler and Zerniak be dismissed without prejudice and with leave to file a Second Amended Complaint limited solely to that claim; and it is hereby

**ORDERED** that the Clerk that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated:  September 3, 2015
       Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge



Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Roberto CIAPRAZI, Plaintiff,
v.
Glenn S. GOORD; et al. Defendants.

No. Civ.9:02CV00915(GLS/.
Dec. 22, 2005.

Roberto Ciaprazi, Clinton Correctional Facility, Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New York, The Capitol, Albany, New York, for the Defendants.

Patrick F. MacRae, Assistant Attorney General, of counsel.

*MEMORANDUM-DECISION AND ORDER*
SHARPE, J.

## I. *Introduction*

**\*1** Plaintiff *pro se* Roberto Ciaprazi brings this action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges that the defendants violated his First, Eighth, and Fourteenth Amendment rights. Pending are Ciaprazi's objections to Magistrate Judge David E. Peebles' Report-Recommendation. Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirety. [FN1]

> FN1. The Clerk is hereby directed to attach the Report-Recommendation to constitute a complete record of the court's decision in this matter.

## II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002. *Dkt. No. 1.* On February 27, 2003, the defendants moved for summary judgment. *Dkt. No. 39.* On March 14, 2004, Judge Peebles issued a Report-Recommendation which recommended that the defendants' motion for summary judgment be granted in part, and denied in part. *Dkt. No. 47.* Ciaprazi objected. *Dkt. No. 48.* His objections are now before this court.

## III. *Discussion* [FN2]

> FN2. The court adopts the factual summary in Magistrate Judge Peebles' Report-Recommendation and assumes familiarity with the facts alleged in Ciaprazi's Complaint. *Dkt. Nos. 47,1.*

### A. *Standard of Review*

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the court may "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate judge." *Id.* Having reviewed the unobjected to portions of the Report-Recommendation, the court adopts them in their entirety because they are not clearly erroneous.

### B. *Report-Recommendation*

Although Judge Peebles examined the merits of the case and found that many of Ciaprazi's claims were meritless, this court only conducts *de novo* review of the objected to portions of the Re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

port-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal involvement claim against defendant Goord. *Id. at 41, 43-4.*[FN3]

> [FN3]. Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by [FRCP 11]. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and this court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

**C. Objections**

**1. First Amendment Claim**

First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right

to be free from false misbehavior reports. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the defendants' actions. Accordingly, Ciaprazi's retaliation claim is dismissed.

**2. Eighth Amendment**

**\*2** Next, Ciaprazi objects to Judge Peebles' finding that he did not have standing to challenge the disciplinary authority of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.* This objection is without merit. As Judge Peebles noted, since the length of Ciaprazi's disciplinary confinement was within the bounds of constitutionally acceptable levels, he has no standing to sue. Second, as Judge Peebles further noted, any generalized complaints Ciaprazi has against the Tier III system are more appropriately addressed as part of his due process claims. Accordingly, Ciaprazi's claims against the Tier III system are dismissed.

**3. Human Rights Claims**

Ciaprazi also objects to Judge Peebles' finding that he did not have claims under the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICPR). Ciaprazi's contention is without merit. As Judge Peebles noted, Ciaprazi has failed to establish that these treaties provide private causes of action. *See Report Recommendation p. 41, Dkt. No. 47.* Accordingly, Ciaprazi's claims under international law are dismissed.

**4. Personal Involvement**

Ciaprazi also objects to Judge Peebles' dismissal of his personal involvement claim against defendant Goord. As Judge Peebles noted, Ciaprazi merely made allegations against Goord in his supervisory capacity. Accordingly, the personal involvement claim against Goord was properly dismissed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

IV. *Conclusion*

Having reviewed the objected-to portions of the Report and Recommendation *de novo,* the remainder under a clearly erroneous standard, and Ciaprazi's objections, this court accepts and adopts the recommendation of Judge Peebles for the reasons stated in the March 14, 2004 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, the defendants' motion be DENIED.

IT IS SO ORDERED.

REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison inmate who by his own account has frequently lodged complaints against prison officials and been openly critical of their practices, has commenced this proceeding against the Commissioner of the New York State Department of Correctional Services ("DOCS") and several of that agency's employees pursuant to 42 U.S.C. § 1983, complaining of constitutional violations occurring during the course of his confinement. In his complaint, Ciaprazi alleges that 1) a misbehavior report was filed against him in retaliation for his having previously engaged in protected activity; 2) he was deprived of procedural due process during the course of the hearing and resulting adverse finding associated with that misbehavior report; and 3) the conditions which he faced while in disciplinary confinement, following that hearing, were cruel and

unusual. Plaintiff asserts claims pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as under certain international human rights accords.

**\*3** Currently pending before the court is a motion by the defendants seeking summary judgment dismissing plaintiff's complaint in its entirety. Having carefully reviewed the record in light of Ciaprazi's claims and defendants' arguments, I find that many of plaintiff's causes of action are devoid of merit, as a matter of law, and thus subject to dismissal. Because I find the existence of genuinely disputed issues of material fact surrounding certain of plaintiff's claims, however, including notably his due process claim against defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers, I recommend denial of defendants' motion seeking dismissal of plaintiff's claims against them.

I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred into the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well as other "deprivations" of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occur-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

ring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10). [FN1] Defendants' Motion (Dkt. No. 39) Exh. A.

> FN1. Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,* 7 N.Y.C.R.R. 251-2.2.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152.[FN2] Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie, was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal, Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

> FN2. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

*\*4 At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed.[FN3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

> FN3. Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

On August 20, 1999, plaintiff was transferred into

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to "loud and non-stop noise from other frustrated prisoners yelling and banging on the doors," as well as the denial of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests "were ignored"; and he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No. 1) ¶ 54..

## II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis,* commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's prison system. Complaint (Dkt. No. 1) at 14-16. Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

**\*5** Following the filing of an answer on behalf of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[FN4] Dkt. No. 39. Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[FN5] Dkt. No. 46. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN4. There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure to prove that defendant Fitzpatrick had in fact been served. *See* Dkt. No. 35.

> FN5. In his papers in opposition to defend-

ants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. *See, e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed.

Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word "unknown" in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

§ 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a)(1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. [FN6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

FN6. A material fact is genuinely in dispute

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**B.** *Plaintiff's First Amendment Retaliation Claim*

**\*6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action. Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could con-

clude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 81-83. Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison offi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

cials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant

Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [FN7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

> FN7. Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions.[FN8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g., Flaherty,* 713 F.2d at 13.

> FN8. The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011-12 (2d Cir.1986).

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993). Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

**\*8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions, defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims, including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters were motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in tem-

poral proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick and Rogers. At best, plaintiff has argued that prior to July 31, 1999 he "filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant Fitzpatrick." *Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint "may be and apparently is a relative of defendant Fitzpatrick." *Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of "gross abuse of power", requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

**\*9** While there is some appeal to finding the req-

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

uisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary hearing.[FN9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

> FN9. Prior to the Second Circuit's recent decision in *Gill,* defendants perhaps could have effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g., Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992). In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi, in somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment.[FN10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

> FN10. That amendment provides, in pertinent part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*10** Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates; 5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, de-

fendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement.[FN11]

> [FN11]. In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello,* No. 90-CV-382, 1996 WL 863518, at *8-*9 (W.D.N.Y. June 10, 1996) (Tier III regulations pass

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

constitutional muster).

D. *Plaintiff's Procedural Due Process Claim*

In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

**\*11** To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

1. *Liberty Interest*

Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons,

arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14. The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g., Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995) (involving revocation of assignment to "shock incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also Montayne v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976) (no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at \*6 (S.D.N .Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin*. Atypicality in a *Sandin* inquiry normally presents a question of law.[FN12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[FN13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

> **FN12.** In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

> **FN13.** While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin (see id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

**\*12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

### 2. *Due Process*

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report.[FN14]

> FN14. Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993). Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v. Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding in light of his submissions, I find that this standard has been met.

**\*13** Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.[FN15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

> FN15. Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. *Eng,* 858 F.2d at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

*F. Equal Protection*

In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

**\*14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others." *Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts.[FN16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ... learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29. Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his part as to this premise, arguing that "discrimination based on national origin *may* ... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

FN16. Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

G. *United Nations Resolutions*

*15 Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. *Standt v. City of New York,* 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S. No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent that the defendants argue otherwise, and contend that treaties-as distinct from constitutional and other types of

federal statutory provisions-cannot support a claim for section 1983 liability, *see* Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not.[FN17] *See, e.g.,* *Poindexter v. Nash,* 333 F.3d 372, 379 (2d Cir.2003); *Murray v. Warden, FCI Raybrook,* No. 9:01-CV-255, 2002 WL 31741247, at *11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing *U.S. ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002) and *Reaves v. Warden,* No. Civ. A3:01-CV-1149, 2002 WL 535398, at *9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-binding." *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 167-68 (2d Cir.2003).

FN17. Even in one of the cases relied heavily upon by the plaintiff, *Maria v. McElroy,* 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has since been effectively overruled on other grounds, *see Restrepo v. McElroy,* 369 F.3d 627 (2d Cir.2004)-the court recognized that the ICCPR was not "self-executing". 68 F.Supp.2d at 231.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

**\*16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

H. *Personal Involvement*

Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom

under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32. This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under section 1983, and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's complaint, I recommend that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); "mere 'linkage in the prison chain of command' is insufficient to implicate a state

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

IV. *SUMMARY AND RECOMMENDATION*

**\*17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon the lack of his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

N.D.N.Y.,2005.
Ciaprazi v. Goord
Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Patrick GUILLORY, Plaintiff,
v.
Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB).
Signed Aug. 29, 2014.

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The Capitol, Gregory J. Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1 Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action, pursuant to 42 U.S.C. § 1983, on May 31, 2011. See Dkt. No. 1. The remaining claims are that Defendants violated Plaintiff's constitutional rights under the First Amendment's Free Exercise Clause, as well as his rights under the Religious Land Use and Institutionalized Person's Act ("RLUIPA"), and subsequently retaliated against him for attempting to exercise these rights by destroying Plaintiff's mail and thus denying him access to the courts. See Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July 23, 2014, Magistrate Judge Baxter recommended that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint in its entirety. See Dkt. No. 210. Specifically, Magistrate Judge Baxter first found that in relation to the December 7, 2010 incident, Defendant Ready acted within the bounds of his employment and according to the documentation before him and thus, his inadvertent denial that caused Plaintiff to miss one religious service did not substantially burden Plaintiff's free exercise of his religion. See id. at 14. With regards to the March 20, 2011 incident, Magistrate Judge Baxter found that Defendant Ellis was not responsible for the shortened duration of the Purim celebration, and that while the delay may have been an inconvenience, Plaintiff was still able to participate in the service, thus satisfying the requirements of the First Amendment and RLUIPA. See id. at 19–20. Magistrate Judge Baxter also found that neither Defendant Ellis, nor Defendant Ready engaged in the conduct mentioned above as a way to retaliate against Plaintiff for any grievances that he had previously filed either against them or any other correctional officer. See id. at 39–40. Moreover, Magistrate Judge Baxter found that Defendant Kupiec did not interfere with Plaintiff's mail as a means to either retaliate against him or to deny him access to the courts. See id. 35–36. Finally, Magistrate Judge Baxter found that Plaintiff failed to establish that he suffered an adverse action as a result of Defendant Kupiec's alleged conduct. On August 4, 2014, the Court received objections to the Report–Recommendation from Plaintiff. See Dkt. No. 211.

**II. DISCUSSION**

**A. Plaintiff's objections**

In his objection to Magistrate Judge Baxter's Report–Recommendation, Plaintiff states that he objects to the Report in its entirety. See id. Plaintiff relays his astonishment at Magistrate Judge Baxter's choice to "excuse Def [endant] Kupiec's conduct" and at his finding that Plaintiff's position is "unfounded."

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

*See id.* Plaintiff further objects to Magistrate Judge Baxter's Report on the grounds that he looked outside the pleadings and "only to the Defendants Affidavits" when making his determination to grant Defendants' motion for summary judgment. *See id.*

### B. Standard of review

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

### C. Application

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Re-

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

port–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. See *O'Diah, 2011 WL 933846, at *1; see generally* Dkt. No. 211. Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See* Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was in-

stituted to handle issues such as yours." Dkt. No. 202–6 at Exhibit "A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision." *Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

**I.** *Procedural History*

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. FN1 (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

> FN1. Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also dis-

posed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

**\*5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel. (Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

**II.** *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

**III.** *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56*; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might af-

fect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

**IV.** *Religion Claims*

**A. Legal Standards**

**1. First Amendment**

**\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

**2. Religious Land Use and Institutionalized Persons Act**

RLUIPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the **least restrictive** means of achieving that interest. *Id* . The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia,* *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non curat lex'* "). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

**B. Application**

**1. December 7, 2010 Incident:**

Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings.[FN2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

> FN2. Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the pleadings, filed by defendants. (Pl.'s Mem. at ¶¶ 1–7) (Dkt. No.

205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

(S.D.N.Y.2002)). *See also Rodriguez v. It's Just Lunch, Internat'l*, No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[f]ollowing discovery proceedings and multiple motions to dismiss.")

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

**\*8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet. (*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class." (*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to

Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [FN3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah. (*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ." (*Id.* at 7). Although Father Weber states that a copy of the call-out is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

FN3. Father Weber is not a defendant in this action.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility." (Weber Decl. ¶ 8). "Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day." (*Id.* ¶ 9). Although plaintiff's name certainly appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

investigation of plaintiff's grievance resulted in the same finding:

> **\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50).[FN4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him,[FN5] and he would not even have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready.[FN6]

> FN4. Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's

electronic filing system. (CM/ECF).

> FN5. Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–2). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk." (Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

> FN6. Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is *a Program Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7,[FN7] and the fact that the building in which the religious services were actually held had the call-out,[FN8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building.[FN9]

> FN7. (Ready Decl. ¶¶ 5).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

FN8. This court makes no such finding.

FN9. Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to ***report to Bldg # 101*** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going." (*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at *15 (S.D.N.Y. Oct. 15, 1999)). In granting ***summary judgment,*** the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for ***a valid reason.*** " *Id.* (emphasis added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial did not substantially burden the plaintiff's free exercise of his religion. In denying plaintiff the opportunity to attend his call-out, defendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service.[FN10] Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

FN10. To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?" (Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLUIPA) (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

**2. The March 20, 2011 Incident**

***10** The second incident occurred on March 20,

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [FN11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

> FN11. Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at Mid-State with some members of the Lubavitch organization. (*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out.

(*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service." Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id* .)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library. (*Id.* ¶ 11).

**\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m." (*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011.[FN12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

> FN12. The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

Defendants have also submitted the declaration of Rabbi Theodore Max, [FN13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State. (*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m.,

and that the Purim celebration ended at that time. (*Id.* ¶ 12).

> FN13. Rabbi Max is not a defendant in this action.

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

**\*12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49). "Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant,* and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

inmates back to their cells because Rabbi Max had not arrived—plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that **he** was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service.[FN14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

> FN14. In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ... 'The Rabbi is not here so go back to the law library.' " (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived." (*Id.* & Ex. Z). The issue in the grievance appeared to be that the in-

mates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. *As a result, the Jewish Services were shortened* and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing to do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

**V. *Mail/Access to Courts/Retaliation***

**A. Legal Standards**

**1. Mail**

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

**\*13** Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail." *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*) An isolated incident is generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail." *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*) As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest and ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received. *Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. Access to Courts**

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). *See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

**3. Retaliation**

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would

deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' " "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**B. Application**

**1. Defendant Kupiec**

**a. Relevant Facts—Interference/Retaliation**

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [FN15] began to lose and/or destroy plaintiff's packages that were received in the mail room.[FN16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school." (*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [FN17] (*Id.* & Ex. M).

> FN15. Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipu-

lation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

> FN16. The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

> FN17. The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II)(A)(2) (citing 7 NYCRR § 721.2).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011." (Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the plaintiff) files a grievance against the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

defendant's [sic]—retaliation takes place." (*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [FN18] (*Id.*)

> **FN18.** The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl. ¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl. ¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl. ¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [FN19]

> **FN19.** A plaintiff may not amend his complaint in a memorandum of law or other filing. *Bryant v. Greater New Haven Transit Dist.,* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting

administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280. Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13–16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

**\*16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready." (*Id.* ¶¶ 11–12). Defendant Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing.[FN20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

FN20. A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to

exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *Castillo v. Rodas,* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail.[FN21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope.[FN22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

FN21. A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service. (*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

FN22. The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing." (*Id.*) She noted that this was the "normal procedure for mail received in packages." (*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

**b. Discussion**

**\*17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food.[FN23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25,

2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

FN23. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery.[FN24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed.[FN25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail.[FN26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

FN24. Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

FN25. To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

FN26. Plaintiff's response makes much of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011.[FN27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with." (Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when

plaintiff's explanation is not even plausible); *Haust v. United States,* 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

> **FN27.** (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him.[FN28] As stated above, defendant Kupiec does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

> **FN28.** It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The

connection between defendant Kupiec and defendant Ready is non-existent.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). *See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

**\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against de-

fendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against her.[FN29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law,[FN30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room.[FN31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate from asserting his rights.[FN32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

> FN29. Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

> FN30. *Gill, supra.*

FN31. Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was ***not*** a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it, and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

FN32. Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error." (*Id.*)

**b. Access to Courts**

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action.[FN33] Plaintiff's allegation has no basis whatso-

ever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it." (Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent. (*Id.* at 80–82). Plaintiff then stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

FN33. Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage." (*Id.* at 83). Plaintiff then reasserted that the "Court" ***would have*** stricken his "motion"[FN34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

FN34. It is not clear what "motion" would have been stricken.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stat-

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

ing that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

### 2. Defendants Ready and Ellis

*20 Plaintiff alleges that the actions taken by defendants Ready and Ellis were taken in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston.[FN35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts." (Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

> FN35. CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken."[FN36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter." (Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident.[FN37] Thus, he would not have been disciplined or even "advised" of the incident.

The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

> FN36. The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

> FN37. In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received." (*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at *4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated to plaintiff from asserting his rights.[FN38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates.[FN39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

> FN38. In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

> FN39. During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last mi-

nute, so we all just hanging out outside the chapel because Ellis won't open the door." (*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

**VII.** *Personal Involvement*

**A. Legal Standards**

**\*21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

**B. Application**

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants. (*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to in-

terrogatories that her "office" became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id* . at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)." (*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case.[FN40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response.[FN41] However, defendant Boll has included the letter as an attachment to her declaration in support of the summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

FN40. Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

FN41. Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any

action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." FN42 (*Id.* ¶ 9).

FN42. The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." (*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with a explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary." (*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011." (*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have." (*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll merely advised plaintiff that her office had contacted the staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

N.D.N.Y.,2014.
Guillory v. Ellis
Slip Copy, 2014 WL 4365274 (N.D.N.Y.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
ADAMS, Doctor, Upstate Correctional Facility, et al.,
Defendants.

Civil Action No. 9:10–CV–1082 (DNH/DEP).
July 5, 2012.

Johnathan Johnson, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Office of Attorney General State of New York, Adele M. Taylor–Scott, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Johnathan Johnson, a prolific inmate litigant who has been granted leave to proceed *in forma pauperis* ("IFP"), has commenced this action pursuant to 42 U.S.C. § 1983 against the former Deputy Commissioner and Director of Health Services for the New York State Department of Corrections and Community Supervision ("DOCCS"), the Superintendent of the correctional facility in which he is incarcerated, and a physician, a physician's assistant, and two registered nurses who work at that prison, alleging deprivation of his civil rights. In his complaint, Johnson maintains that he has been denied various medications including an inhaler for his alleged chronic obstructive pulmonary disease ("COPD"), Neutrogena soap, and A & D Ointment,

and asserts that the denial represents deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, and was in retaliation for his having filed grievances, in violation of his rights under the First Amendment. Plaintiff's complaint seeks recovery of compensatory and punitive damages in the amount of $1 million each, as well as injunctive and declaratory relief.

Now that discovery is closed, the defendants have moved for summary judgment seeking dismissal of plaintiff's claims on a variety of grounds, including qualified immunity. Also included within their motion is an application by the defendants for revocation of plaintiff's IFP status based upon the "three strikes" provision of 28 U.S.C. § 1915(g). Because it is abundantly clear that plaintiff has accumulated three strikes, within the meaning of that provision, and based upon the lack of any palpable showing of circumstances sufficient to meet the imminent danger exception to the three strikes rule, I recommend that plaintiff's IFP status be revoked and that the remaining portions of defendants' motion be held in abeyance pending plaintiff's payment of the required $350 filing fee.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a New York State prison inmate confined under the supervision of the DOCCS. *See generally* Complaint (Dkt. No. 1). At all times relevant to his complaint, plaintiff was designated to the Upstate Correctional Facility, located in Malone, New York,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**

and remains confined at that facility.[FN2] *Id.*

> **FN2.** Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002). Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

In his complaint plaintiff complains of the failure of prison medical personnel at Upstate to provide him with medical care and treatment. Plaintiff alleges, for example, that on April 8, 2010, Physician's Assistant ("PA") Patrick Johnson discontinued his skin allergy medication, A & D Ointment, soap, and stomach medications based upon his alleged failure to attend a scheduled call out on that date.[FN3] Complaint (Dkt. No. 1) Statement of Facts ¶ 1. On June 10, 2010, according to Johnson, Dr. Adams, a physician assigned to work at Upstate, discontinued all of his prescriptions, including his Provincial inhaler for his COPD as well as his Neutrogena soap, a fact which he attributes to Nurses George Waterson and Heath Baker having told Dr. Adams that according to Johnson those medications were not working.[FN4] *Id.* at ¶¶ 2–6. Plaintiff further alleges that on or about May 8, 2010 PA Johnson discontinued plaintiff's skin ointment, and that from March 2010 to the date of filing of his complaint Nurses Baker, Waterson, and others continuously denied him medical care and treatment for his medical conditions.[FN5] *Id.* at ¶¶ 8–11.

> **FN3.** It appears from plaintiff's medical records that the discontinuation on April 8, 2010 was a result of his refusal to come out of his cell. *See* Plaintiff's Medical Records (Dkt.

No. 43) Entry Dated 4/8/10. Those records also reflect that plaintiff was issued Neutrogena Soap, A & D Ointment, and medication for his stomach two days later on April 10, 2010. *Id.* at Entry Dated 4/10/10.

> **FN4.** In a note authored by a registered nurse on June 12, 2010, it is reported that plaintiff's prescription medications were discontinued by a doctor on June 10, 2010 due to plaintiff's refusal to be seen by the doctor. *See* Plaintiff's Medical Records (Dkt. No. 43) Entry Dated 6/12/10. That notation goes on to indicate that the doctor would consider the plaintiff's need for medication once he was seen for a medical evaluation. *Id.*

> **FN5.** Plaintiff's medical records contain no evidence of cessation of plaintiff's skin ointment on or about May 8, 2010, and in fact indicate that he was provided Vaseline for his skin on that date. *See* Plaintiff's Medical Records (Dkt. No. 43) Entry Dated 5/8/10.

## II. *PROCEDURAL HISTORY*

**\*2** Plaintiff commenced this action on September 9, 2010, and thereafter was granted leave to proceed IFP.[FN6] Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Dr. Lester Wright, the former Deputy Commissioner and Director of Health Services for the DOCCS; David Rock, the Superintendent at Upstate; Dr. Adams, a medical doctor engaged to perform medical services at Upstate; Nancy Smith, the Nurse Administrator at the facility; Patrick Johnson, a PA at Upstate; and Registered Nurses George Waterson and Heath Baker, all of whom are employed by the DOCCS and assigned to work at Upstate. *Id.*

> **FN6.** In my order dated December 23, 2010, granting plaintiff's IFP application, I addressed a potential three strikes concern and, while finding that Johnson had indeed ac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**

cumulated far more than three strikes by the time his complaint was filed, concluded that his allegations met the threshold requirement under the Second Circuit's decision in *Chavis v. Chappius,* 618 F.3d 162 (2d Cir.2010) for alleging imminent danger. Order dated December 23, 2010 (Dkt. No. 4) at pp. 8–9. In that initial order, however, I went on to note that plaintiff's IFP status would be revoked if, as the case progressed, the court concluded that he did not face imminent danger of serious physical at the time he commenced this action. *Id.*

On December 30, 2011, following the completion of discovery, defendants moved for the entry of summary judgment dismissing plaintiff's complaint.[FN7] Dkt. No. 42. In their motion, defendants request revocation of plaintiff's IFP status based upon 28 U.S.C. § 1915(g). In addition, defendants argue that 1) plaintiff's Eighth Amendment cause of action lacks merit; 2) defendants are not exposed to liability damages for actions taken in their official capacities; 3) plaintiff cannot demonstrate the irreparable harm necessary to obtain permanent injunctive relief; 4) defendants Wright, Rock and Smith were not personally involved in the constitutional violations alleged; 5) plaintiff has failed to establish the necessary elements of a retaliation claim; and 6) in any event, the defendants are entitled to qualified immunity. *Id.* Responses in opposition to defendants' motion were received from the plaintiff on January 9, 2012, March 15, 2012, and March 16, 2012. Dkt. Nos. 45, 51, 52. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

> **FN7.** Three separate applications by the plaintiff seeking the issuance of a preliminary injunction were denied by District Judge David N. Hurd, by decision issued on Feb-

ruary 23, 2012. Dkt. No. 47. None of those three motions involved medical treatment rendered to Johnson at Upstate. Plaintiff has appealed the denial of injunctive relief to the Second Circuit. *See* Dkt. No. 48. The pendency of that appeal, however, does not stand as a barrier to deciding the pending summary judgment motion or revoking plaintiff's IFP status. *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1350 (1989).

III. *DISCUSSION*

A. *Three Strikes Provision*

In their motion defendants invoke 28 U.S.C. § 1915(g), arguing that under that section plaintiff's litigation history, which includes for greater than three merit-based dismissals, warrants revocation of his IFP status.

Section 1915(g), which was enacted as part of sweeping inmate litigation reform brought about by adoption of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), though engendering far less litigation than some of its PLRA counterparts including, notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a), provides that

> [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

**\*3** 28 U.S.C. § 1915(g). The manifest intent of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**

Congress in enacting this "three strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues,* 473 F.3d 440, 443–44 (2d Cir.2007); *Gill v. Pidlychak,* No. 9:02–CV–1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. & Treece, M.J.). The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has had three previous strikes to engage in the same cost-benefit analysis that other civil litigants must make before deciding whether to commence suit, accompanied by the filing of the full fee—that is, to assess whether the result to be achieved justifies the filing fee expenditure. *Tafari,* 473 F.3d at 444; *Ibrahim v. District of Columbia,* 463 F.3d 3, 6 (D.C.Cir.2006). As the Second Circuit has noted, in the context of PLRA amendments requiring inmates to authorize prison officials to make deductions from inmate accounts to be applied as partial payments of appellate filing fees for prisoners granted *in forma pauperis* status,

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing law suits. Indeed, the very nature of incarceration—prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials—has fostered a " 'nothing to lose and everything to gain' " environment which allows inmates indiscriminately to file suit at taxpayers' expense.

*Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997), *cert. denied sub nom., Nicholas v. Miller,* 523 U.S. 1126, 118 S.Ct. 1812 (1998) (internal citations omitted); *see also Gill,* 2006 WL 3751340, at *2.

The question of whether the dismissal of a prior action qualifies as a strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such a question for the court.[FN8] *Tafari,* 473 F.3d at 442–43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. *Tafari,* 473 F.3d at 442 (citing *Andrews v. King,* 398 F.3d 1113, 1121 (9th Cir.2005)).

> FN8. The Second Circuit has expressed its view that the time for determination of "strikes" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that tion. *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir.2004); *see also Snider v. Melindez,* 199 F.3d 108, 115 (2d Cir.1999) ("We ... doubt whether the entry of a strike is properly considered at the time an action is dismissed").

B. *Application of Section 1915(g)*

It appears to be firmly established that prior to commencing this action plaintiff had accumulated three or more strikes falling within section 1915(g), and Johnson seemingly does not dispute this fact. When asked to list previous lawsuits relating to his imprisonment in the form utilized to file his complaint, plaintiff noted simply "three strikes". *See* Complaint (Dkt. No. 1) § 5. The fact that Johnson has accumulated at least three strikes is confirmed in a report and recommendation authored by Magistrate Judge George H. Lowe, and adopted by Senior District Judge Lawrence E. Kahn, in 2008. *See Johnson v. Connolly,* No. 9:07–CV–0158 (LEK/GHL), 2008 WL 724167 (N.D.N.Y. Mar. 17, 2008). In his report in that action, Judge Lowe chronicled plaintiff's extensive prior litigation history, which at that point included the filing of forty-six prisoner civil rights actions and,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**

after making the required analysis, concluded that plaintiff had acquired three strikes at a minimum, for purposes of section 1915(g), by the time the complaint in that action was filed.[FN9] *Id.* at \* 8; *see also Johnson v. Fischer,* No. 11–CV–386 (GLS/DRH), 2011 WL 6945706, at \*4 (N.D.N.Y. Dec. 22, 2011) (finding that plaintiff had accumulated three strikes but could potentially satisfy the imminent danger exception based upon his allegation that he was the target of enemy gang members and prison officials did nothing to protect him, resulting in his being assaulted). This is consistent with an earlier determination issued by another court in 2005 finding that at that time, plaintiff had acquired at least five strikes. *See Johnson v. Goord,* No. 05–CV–6084 *slip op.* at p. 2 (W.D.N.Y., filed Feb. 28, 2005) (Telesca, J.), and a subsequent finding from that court later in 2005 that at that point plaintiff had acquired at least eight strikes. *See Johnson v. Worley,* No. 05–CV–6602, *slip op.* at p. 2 (W.D.N.Y., filed Nov. 18, 2005) (Siragusa, J.).

> FN9. According to publically available records, with the subsequent filing of this action and others, it appears plaintiff has filed in excess of fifty-three civil rights actions, while incarcerated, not including federal habeas corpus actions, federal court appeals, state court actions, or state court appeals.

**\*4** I therefore conclude that plaintiff had accumulated well in excess of three strikes, within the meaning of section 1915(g), by the time this action was filed.

### C. Imminent Danger Exception

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of section 1915(g). *See* 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562–63 (2d Cir.2002). In accordance with

this exception, an inmate who has had three prior "strikes" but nonetheless wishes to commence a new action *in forma pauperis* must show that he or she was under imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes on the basis of past harm. *Malik,* 293 F.3d at 562–63; *see also Chavis v. Chappius,* 618 F.3d 162, 169 (2d Cir.2010). An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of exposure to a "serious physical injury." 28 U.S.C. § 1915(g). The imminent danger claimed by the inmate, moreover, must be real, and not merely speculative or hypothetical. *Johnson v. Barney,* No. 04 Civ. 10204, 2005 WL 2173950, at \*1–2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, does not establish imminent danger).

For a three-strikes litigant to qualify for the imminent danger exception, his or her complaint "must reveal a nexus between the imminent danger it alleges and the claims it asserts." *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009). When determining whether the requisite relationship is present a court must examine "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is *fairly traceable* to unlawful conduct asserted in the complaint and (2) whether a favorable judicial outcome would *redress* that injury." *Id.* at 299 (emphasis in original).

The term "serious physical injury," as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death [.]" *Ibrahim,* 463 F.3d at 7. In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney,* 281 F.3d 709, 710 (8th Cir.2002).

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**

Conditions which have been held to rise to a sufficient threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin,* *281 F.3d at 710;* denial of adequate treatment for *Hepatitis C, a* "chronic and potentially fatal disease," *Ibrahim, 463 F.3d at 6–7;* and patterns of harassment from corrections officers, heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini, 352 F.3d 328, 330–31 (7th Cir.2003)* (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

**\*5** Plaintiff's eligibility for IFP status turns on whether he can establish that he faced imminent danger of serious physical injury on September 9, 2010, when this action was filed. Any potential claim of imminent danger in this case is belied by plaintiff's complaint as well as other portions of the record now before the court. A review of plaintiff's medical records, for example, reveals that the principal cause of the denial of medical care and medications of which he complains has been his refusal to be seen by a physician and to comply with the protocols associated with dispensing those medications, requiring him to recite his name and DIN number before receiving medications while in SHU confinement. *See* Smith Decl. ¶¶ 6–13; *see also* Plaintiff's Medical Records (Dkt. No. 43); Scott Decl. (Dkt. No. 42–2) Exh. E., Transcript of Plaintiff's Deposition of May 6, 2011 at pp. 35–36, 44–45. This same conclusion was reached by another court in connection with a challenge brought by the plaintiff pursuant to New York Civil Practice Law & Rules ("CPLR") Article 78, with Acting Supreme Court Justice Michael Melkonian observing the following regarding Johnson's conduct:

> It is noteworthy ... that petitioner fails to mention that the medicine has been held back in part because of petitioner's refusal to be examined by a facility doctor. Petitioner's refusal to comply with minor formalities that he believes are unnecessary demonstrates that petitioners [sic] medical conditions and his need for the medications are not as

important to petitioner as his desire to assert himself and establish control over how the respondents do their work.

Scott Decl. (Dkt. No. 42–2) Exh. D, slip op. at p. 3. Indeed, during his deposition Johnson essentially acknowledged that he himself was the cause of any deprivation of medication, and that were he truly at risk because of that deprivation he held the key to recurring treatment and medication, needing only comply with the required protocols, testifying as follows:

Q. Mr. Johnson, who is the person who's being allegedly deprived of anything as a result of your behavior?

A. Johnson.

Q. Thank you.

A. Ask me do I care.

Q. Okay. It's no sweat off your back then?

A. As long as I can put a lawsuit in against it, no, it's no sweat off my back....

Scott Decl. (Dkt. No. 42–2) Exh. E, at p. 62.

A careful review of plaintiff's medical records covering the period leading up to and including when this action was filed, medical personnel at Upstate attempted, on literally a daily basis, to provide medication and treatment to the plaintiff in his SHU cell. Plaintiff's medical records are replete with notations showing that it was as a result of his actions, including his refusal to comply with prison policies, that he was not provided with medications and treatment. On November 8, 2010, for example, a medical provider (whose signature is illegible) noted the following on plaintiff's ambulatory health record:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**

**\*6** Upon arrival to cell, asked inmate his name ⚷DIN. Inmate refused to provide and responded "you know my name ⚷DIN you Homo." Conversation terminated and inmate stated "you'll be named in the lawsuit" and continued to shout profanities and insults while Nurse was on gallery. Not provided.

*See* Plaintiff's Medical Records. (Dkt. No. 43) Entry Dated 11/8/10. On many other dates plaintiff hurled obscenities or issue threats toward medical staff members at the facility. *See, e.g.,* Plaintiff's Medical Records (Dkt. No. 43) Entry Dated 5/10/10 ("verbally abusive"); 5/16/10 ("verbally inappropriate"); 5/22/10 ("I/M became verbally abusive"); 5/29/10 ("hollering obscenities"); 6/22/10 ("swearing, verbal harassment to staff"); 6/26/10 ("verbally inappropriate"); 6/28/10 ("verbally abusive"); 7/3/10 ("verbally inappropriate"); 7/4/10 ("verbally harassing staff", "swearing"); 7/6/10 ("verbally abusive"); 7/10/10 ("verbally abusive"); 7/11/10 ("verbally inappropriate"); 7/17/12 ("swearing at nurse"); 7/18/12 ("swearing at nurse"); 7/21/10 ("verbally abusive toward staff"); 7/22/12 ("inappropriate"); 7/23/12 ("swearing @ staff, threatening, [with] physical harm"); 7/24/12 ("vulgar obscene language"); 7/28/10 ("threatening to sexual violate [nurse]"); 7/27/12 ("swearing and threatening nurse"); 7/31/10 (stating to nurse "I want to stick my finger up your ass you little slut"); 8/1/10 ("inappropriate"); 8/2/10 ("inappropriate verbal harassment"); 8/3/10 ("verbal harassment towards staff"); 8/4/12 ("verbally abusive swearing at staff"); 8/6/12 ("inappropriate behavior"); 8/9/12 ("inappropriate @ cell door, swearing at staff threatening violence"); 8/12/10 ("swearing at nurse"); 8/18/10 (stating to nurse "suck my dick"); 8/26/10 (stating to nurse that he would come out of cell "if you suck my dick"); 9/7/10 ("verbally abusive"); 9/8/10 ("swearing verbally inappropriate"); 9/16/10 ("standing @ cell door yelling"); 9/25/10 (stating to nurse "get the f_ck away from my window"); 9/26/10 (stating to nurse "I hate you mother fu_ker"); 9/29/10 ("swearing @ staff"); 10/10/10 ("swearing @ staff, inappropriate behavior"); (10/13/10 "verbally inappropriate"); 10/21/10 (referring to nurse as an "alcoholic"); 10/26/10 ("verbally inappropriate"); 10/30/10 ("swearing at nurse"); 11/1/10 ("swearing at staff"); 11/2/10 ("swearing at staff"); 11/3/10 ("inappropriate behavior"); 11/7/10 ("vulgar and inappropriate language toward nurse"); 11/14/10 ("aggressive behavior, scream extreme vulgarity—unable to redirect behavior"); 11/21 /10 ("swearing at nurse"); 11/22/12 ("swearing at staff"); 11/24/10 ("inappropriate behavior"); 11/26/10 ("dangerous behavior"); 11/27/10 ("inmate began yelling swearing and threatening verbally"); 12/1/10 ("noncompliant, swearing at staff"); 12/10/12 ("swearing @ nurse"); 12/10/12 ("threatening staff [with] violence"); 12/11/12 ("swearing"); 12/24/11 ("swearing @ staff inappropriate language"); 12/26/12 ("swearing & name-calling"); 12/28/12 ("swearing at staff"); 12/29/12 (referring to nurse as a "dick sucker"); 1/6/11 ("verbally abusive toward staff"); 1/17/11 (when asked for name and DIN responding "I'll see you in court mother fucker"); 1/20/11 ("becoming verbally abusive screaming obscenities and racial/sexual slurs"); 1/21/11 ("yelling racial and sexual slurs at RN"); 1/25/12 ("yelling sexual and racial slurs @ an RN"); 1/25/11 ("vulgar/inappropriate"); 1/30/12 ("vulgar remarks verbalized").

**\*7** At the heart of plaintiff's complaint is his claim that prison officials discontinued his prescription medications. Plaintiff's health records show, however, that plaintiff's prescription drugs were discontinued based upon his refusal to be seen by the prison physician. *See* Plaintiff's Medical Records (Dkt. No. 43) Entry Dated 6/12/10. On September 18, 2010—nine days after commencement of this action—plaintiff complained of dry skin and gas, and was provided with sinus medication as well as A & D ointment. *See* Plaintiff's Medical Records. *See id.* at Entry Dated 9/18/10. On the following day, plaintiff was provided with Vaseline for his dry skin and athletes foot cream for a fungal condition. *See id.* at Entry Dated 9/19/10.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)
**(Cite as: 2012 WL 3052957 (N.D.N.Y.))**

In sum, a careful review of the record now before the court, even when viewed in a light most favorable to the plaintiff fails to disclose any basis for concluding at the time this action was filed, he was exposed to imminent danger of serious physical injury. Plaintiff has therefore failed to demonstrate his entitlement to this narrow exception to the PLRA's three-strike statutory provision.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff, a persistent litigant in this and other courts, brings this action to challenge defendants' failure to provide him with desired medication and treatment while in SHU confinement at Upstate. A review of the plaintiff's litigation history reveals that without dispute, he has incurred three or more strikes falling within 28 U.S.C. § 1915(g). The record further fails to disclose a basis to conclude that at the time this action was filed he was in imminent danger of serious physical injury, even under the arguably relaxed standard announced by the Second Circuit in *Chavis*. A review of plaintiff's litigation history and his conduct during the course of this action makes it clear that to the plaintiff, litigation is a form of recreation of the type which the PLRA's three strikes provision was intended to curb. Plaintiff's repeated filing of actions in this and other courts not only unduly harasses prison officials, but burdens already over-taxed court resources and those of the Office of the Attorney General, which is called upon to defend against such claims.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that plaintiff's *in forma pauperis* status be REVOKED, and that he be required to pay the required filing fee within thirty days of the issuance of an order adopting this report and recommendation, and that his complaint be dismissed in the event of his failure to pay the statutory $350 filing fee;

and it is further hereby

RECOMMENDED, that the substantive portions of defendants' summary judgment motion (Dkt. No. 42) be held in abeyance, and that in the event the plaintiff does pay the required filing fee, that the matter be returned to me for consideration of the remaining portions of defendants' motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*8** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2012.
Johnson v. Adams
Not Reported in F.Supp.2d, 2012 WL 3052957 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
Jeff McKAY, Gail Haponik, Dr. Carl Koenigsmann,
Joseph Bellinier, Maureen E. Boll, Brian Fischer,
David Rock, Theodore Zerniak, and Donald Uhler,
Defendants.

No. 9:14–CV–0803 (BKS/TWD).
Signed April 16, 2015.

Jonathan Johnson, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, by David J. Sleight, Esq., Main
Place Tower, Buffalo, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER
Hon. BRENDA K. SANNES, District Judge.
### I. Introduction
**\*1** Plaintiff pro se Johnathon Johnson brings this
action against defendants Jeff McKay, Gail Haponik,
Dr. Carl Koenigsmann, Joseph Bellinier, Maureen E.
Boll, Brian Fischer, David Rock, Theodore Zerniak,
and Donald Uhler, asserting claims under 42 U.S.C. §
1983 and New York state law arising out of his in-
carceration at Upstate Correctional facility. (Dkt. No.
5). Plaintiff alleges that defendants: (1) denied him
access to the courts by depriving him of paper, mail,
outside communications, and access to the prison law
library; and (2) denied him videotapes for and access
to inmate grievance procedures. (Dkt. No. 5). Plaintiff
originally filed a verified complaint in State of New
York Supreme Court, Franklin County on April 16,

2013. (Dkt. No. 1–1). On July 2, 2014, defendants
removed the action to this Court. (Dkt. No. 1). On July
7, 2014, defendants moved to dismiss the Complaint
for failure to state a claim under Federal Rule of Civil
Procedure 12(b)(6). (Dkt. No. 2). Plaintiff filed an
affirmation in opposition to defendants' motion, and
sought to remand this action back to State Court.
(Dkt.Nos.6, 7). On December 9, 2014, the Court de-
nied plaintiff's motion to remand. (Dkt. No. 9).[FN1]

> FN1. On February 4, 2015, this case was re-
> assigned to the undersigned for all further
> proceedings. (Dkt. No. 18).

Upon referral pursuant to 28 U.S.C. §
636(b)(1)(B) and Local Rule 72.3(c), United States
Magistrate Judge Thérèse Wiley Dancks issued a
Report–Recommendation and Order ("Re-
port–Recommendation"), dated March 4, 2015, rec-
ommending that defendants' motion to dismiss for
failure to state a claim be granted, and that plaintiff be
granted leave to amend his claim regarding access to
the courts, but denied leave to amend his claim re-
garding access to the grievance program. (Dkt. No. 19,
pp. 10–11). Magistrate Judge Dancks found that
plaintiff was not denied access to the courts because
he filed myriad federal lawsuits during the time period
in which he alleges that he was deprived of paper,
mail, outside communications, and access to the
prison law library, and therefore, plaintiff failed to
plead an actual injury. (Id., p. 9). With respect to
plaintiff's claim that he was denied evidence for and
access to grievance procedures, Magistrate Judge
Dancks found that plaintiff failed to state a claim
because prison inmates have no protected constitu-
tional interest in grievance proceedings. (Id., p. 10).

Plaintiff has filed several objections to the Re-
port–Recommendation. (Dkt. No. 20). First, plaintiff
objects to the recommended dismissal of his denial of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

access to the courts claim on the grounds that the Court improperly took judicial notice of other lawsuits plaintiff has brought without giving him the opportunity to be heard. (*Id.,* pp. 7–10). Plaintiff further argues that the Court improperly "resolve[d][a] factual dispute" regarding his access to the courts, and "did not treat the defendants' motion to dismiss as a motion for summary judgment." (*Id.,* p. 6). Plaintiff also argues that the public records considered by the Court did not include his cases dismissed for failure to prosecute. (*Id.,* p. 12).

**\*2** Second, plaintiff objects to the recommended dismissal of his claim for denial of access to grievance procedures on the grounds that "Plaintiff's involvement in filing claims against prison officials, and helping others do so, was protected activity as it was an exercise of his right to petition the government for redress of grievances under the First Amendment." (Dkt. No. 20, p. 14). Third, plaintiff objects that the Report–Recommendation "failed to address Johnson's supplemental [state law] claims." (*Id.,* p. 16). Plaintiff argues that access to grievance procedures is protected under New York state law, and therefore, his claims "would be properly adjudicated by this court." (*Id.*).

Defendants have not responded to plaintiff's objections. For the reasons set forth below, the Report–Recommendation is adopted in its entirety.

## II. Standard of Review

This Court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been specifically objected to by plaintiff. *Petersen v. Astrue,* 2 F.Supp.3d 223, 228–29 (N.D.N.Y.2012); Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). To be specific, the objection must, with particularity, "identify the portions of the proposed findings, recommendations, or report to which it has an objection and the basis for the objection." N.D.N.Y. L.R. 72.1(c). Under *de novo* review, the Court must "examine the entire record, and make an independent assessment of the magistrate judge's

factual and legal conclusions." *Almonte v. N.Y. State Div. of Parole,* No. 04 Civ. 484, 2006 U.S. Dist. LEXIS 2926, at \*15, 2006 WL 149049, at \*5 (N.D.N.Y Jan. 18, 2006) (citing *United States v. Raddatz,* 447 U.S. 667, 675, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). Findings and recommendations that are not objected to are reviewed for clear error. *Petersen,* 2 F.Supp.3d at 229; *see also* Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. Where only vague or general objections are made, or a party resubmits the same papers and arguments that have already been considered by the magistrate judge, the findings and recommendations are also reviewed for clear error. *Petersen,* 2 F.Supp.3d at 228–229. After review, the Court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C).

A complaint shall be dismissed on defendant's motion when it fails to "state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to re-

lief." *Id.* at 679 (internal citation and punctuation omitted). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555).

**\*3** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). Thus a pro se complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). Although pro se complaints must be construed liberally, civil rights complaints "must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983 ." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987).

### III. Discussion

In view of plaintiff's specific objections, this Court conducts a *de novo* review of the portions of the Report–Recommendation regarding plaintiff's claims for denial of access to the courts and denial of evidence for and access to inmate grievance procedures.

### A. Denial of Access to the Courts

Plaintiff alleges that defendants denied him access to the courts from 2007 to 2013 by depriving him of paper, mail, outside communications, and access to the prison law library. (Dkt. No. 5, pp. 2–3). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."

*Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). To state a claim for denial of access to the courts under § 1983, plaintiff must allege facts to plausibly suggest: "(1) a 'nonfrivolous, arguable underlying claim' that has been frustrated by the defendants' actions, and (2) a continued inability to obtain the relief sought by the underlying claim." *Arar v. Ashcroft,* 585 F.3d 559, 592 (2d Cir.2009) (quoting *Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)).

"[T]he right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury,* 536 U.S. at 415. In order words, plaintiff must demonstrate an "actual injury" by showing that his underlying claim was non-frivolous. *Lewis v. Casey,* 518 U.S. 343, 351–353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (reasoning that the "actual injury" requirement means that inmates must "demonstrate that a nonfrivolous legal claim ha[s] been frustrated or was being impeded."). "It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint." *Harbury,* 536 U.S. at 415. Ultimately, "the complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued." *Id.* at 417.

**\*4** Here, plaintiff has failed to state any facts to suggest what underlying claim or claims were allegedly frustrated by defendants. Instead, plaintiff makes a blanket statement "that he was denied access to the Courts, Federal and State, pending criminal and civil proceeding due to the Paper Deprivation Order, from 2007, 2008, 2009, 2010, 2011, and from March–April 2013." (Dkt. No. 5, p. 2). Plaintiff also alleges that he was denied access to the prison law library, postal mail, and outside communications during the same period. (*Id.,* at 3). As for an injury, plaintiff alleges

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

only that "as a result of the Access to the Courts denial Plaintiff has lost all appeals with the Third Department–Supreme Court of the State of New York ... And the Supreme Court of the State of New York–Albany County" during the same time period. (*Id.,* at 4).

Thus, while the Complaint contains sufficient facts to plausibly suggest that defendants frustrated his right to access the courts, plaintiff has failed to identify any underlying cause of action. To state a claim for denial of access to the courts, plaintiff must plead the underlying claim and facts to plausibly suggest that it is not frivolous. Plaintiff's allegation that he sustained an injury because he lost appeals in State Court is entirely conclusory because he failed to describe the underlying claims. While a complaint must be construed in the light most favorable to the plaintiff, the complaint must still contain "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. The Court finds that plaintiff has failed to state a plausible claim for denial of access to the courts because the Complaint alleges no facts to suggest an actual injury.

Plaintiff argues that in recommending dismissal of his claim for denial of access to the courts, Magistrate Judge Dancks improperly took judicial notice of his litigation history. (Dkt No. 20, pp. 7–10). Under *Federal Rule of Evidence 201,* a court "may take judicial notice on its own" of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fed.R.Evid. 201(b)-(c).* Further, "it is well established that courts may take judicial notice of publicly available documents on a motion to dismiss." *In re DDAVP Indirect Purchaser Antitrust Litig.,* 903 F.Supp.2d 198, 208 (S.D.N.Y.2012); *see also Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (courts can "look to public records ... in deciding a motion to dismiss."). Thus, plaintiff's pro-

lific litigation history,[FN2] which is a matter of public record, is a proper subject of judicial notice. *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) ("A court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings, but not for the truth of the matters asserted in the other litigation.") (internal citation omitted).

FN2. *See, e.g., Johnson v. Adams,* No. 10 Civ. 1082, 2012 U.S. Dist. LEXIS 104723, 2012 WL 3052957 (N.D.N.Y. July 5, 2012) (recounting plaintiff's litigation history). An additional review of the Public Access to Court Electronic Records database shows that, at a minimum, plaintiff filed federal cases in the Northern District of New York under the following docket numbers from 2007 to 2013: 9:07–cv–00158–LEK–GHL, 9:07–cv–01018–DNH–DRH, 9:07–cv–01237–TJM–DEP, 9:08–cv–00196–DNH, 9:09–cv–00244–DNH–GHL, 9:09–cv–01431–GTS, 9:10–cv–00247–DNH–DRH, 9:10–cv–00342–GLS, 9:10–cv–00436–GLS–RFT, 9:10–cv–00860–FJ–RFT, 9:10–cv–00861–LEK–DEP, 9:10–cv–01082–DNH–DEP, 9:11–cv–00386–GLS–CFH, 9:12–cv–00019–NAM–TWD, 9:12–cv–00091–MAD, 9:12–cv–00329–GTS–DEP.

**\*5** Moreover, a court may consider matters that are subject to judicial notice, such as plaintiff's past lawsuits, without converting a motion to dismiss into one for summary judgment. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Xiotech Corp. v. Express Data Prods. Corp., ESI, LLC,* 11 F.Supp.3d 225, 234

(N.D.N.Y.2014). However, the Court has confined its review to the Complaint in assessing plaintiff's denial of access to the courts claim. As discussed above, the Court finds, without reference to plaintiff's litigation history, that the Complaint fails to state a plausible claim for denial of access to the courts.

Accordingly, as recommended by Magistrate Judge Dancks, plaintiff is granted leave to amend the Complaint to plead facts detailing the specific non-frivolous claim or claims that defendants are alleged to have frustrated. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (A pro se complaint should not be dismissed "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.") (internal citation omitted). Therefore, plaintiff's objection to the Report–Recommendation regarding his claim for denial of access to the courts is without merit.

**B. Denial of Evidence for and Access to Inmate Grievance Procedures**

Plaintiff also objects to the recommended dismissal of his First Amendment claim for denial of access to inmate grievance procedures. (Dkt. No. 20, p. 14). In support, plaintiff cites numerous cases where inmates brought First Amendment claims related to issues with the Inmate Grievance Program. (*Id.*). However, the cases on which plaintiff relies all involve First Amendment *retaliation* claims. *See Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Graham v. Henderson,* 89 F.3d 75 (2d Cir.1996); *Scott v. Coughlin,* 344 F.3d 282 (2d Cir.2003); *Morales v. Mackalm,* 278 F.3d 126 (2d Cir.2002). Here, plaintiff alleges that he was denied the full opportunity to file a grievance, not that he suffered retaliation for filing a grievance. Therefore, in the absence of any facts suggesting a First Amendment retaliation claim, the cases cited by plaintiff are inapplicable.

Plaintiff has a constitutional right to petition the government, through the courts, for the redress of "grievances" in the general sense. *See Bill Johnson's Restaurants. Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983); *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). However, specific "inmate grievance programs created by state law are not required by the Constitution, and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable [Section] 1983 claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005); *see also Brown v. Graham,* 470 F. App'x 11, 13 (2d Cir.2012) (holding that a prisoner litigant's claim that he has a "federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless."); *Alvarado v. Westchester Cnty.,* 22 F.Supp.3d 208, 214 (S.D.N.Y.2014); *Mimms v. Carr,* No. 09 Civ. 5740, 2011 U.S. Dist. LEXIS 61853, at *30, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("The First Amendment is not implicated ... where prison officials deny an inmate access to grievance procedures."); *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996) ("[M]ere violations of the grievance system do not violate the Constitution.").[FN3]

FN3. In at least two other cases, plaintiff has made precisely the same grievance denial claim, and courts have rejected it for the same reason. *See Johnson v. Gonzalez,* No. 14 Civ. 745, 2015 U.S. Dist. LEXIS 31516, at *8–9, 2015 WL 1179384, at *5 (N.D.N.Y. Feb.20, 2015) ("[B]ecause the IGPs are created under state law, and, thus, not required by the Constitution, allegations against prison officials for violation of, or interference with, those procedures cannot give rise to a cognizable claim under § 1983."); *Johnson v. Barney,* No. 04 Civ. 10204, 2006 U.S. Dist. LEXIS 90398, at *7, 2006 WL 3714442, at *2 (S.D.N.Y. Dec.13, 2006) ("[I]nmate grievance procedures are not even constitutionally required.").

**\*6** Thus, even assuming that defendants denied

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

plaintiff evidence for or access to inmate grievance procedures at Upstate Correctional Facility, such facts simply do not implicate the First Amendment or give rise to a constitutional claim. Accordingly, plaintiff's objection to the Report–Recommendation regarding his claim for denial of evidence for and access to inmate grievance procedures is without merit.

**C. State Law Claims**

Finally, plaintiff argues that his Complaint should not be dismissed because, even if his § 1983 claims are dismissed, he has also alleged claims under New York state law. (Dkt. No. 20, pp. 15–18). Liberally construing the Complaint, plaintiff has alleged violations of Article 1, Sections 5 and 6 of the New York State Constitution parallel to his federal claims for denial of access to the courts and denial of evidence for and access to grievance procedures. (Dkt. No. 5, p. 5). However, in light of the dismissal of plaintiff's federal claims, and given the early stage of the case, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims at this juncture. *See* 28 U.S.C. § 1367(c)(3); *Valencia v. Sung M. Lee,* 316 F.3d 299, 306 (2d Cir.2003). In the event plaintiff amends the Complaint to state a valid claim for denial of access to the courts, the Court will exercise jurisdiction over his state law claims.

In conclusion, after carefully reviewing all of the papers in this action, including Magistrate Judge Dancks's Report–Recommendation, and Plaintiff's Objections thereto, the Court concludes that the Report–Recommendation is correct in all respects.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that the Report–Recommendation (Dkt. No. 19) is **APPROVED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss

for failure to state a claim (Dkt. No. 2) is **GRANTED,** and it is further

**ORDERED** that plaintiff's claim for denial of evidence for and access to grievance procedures is **DISMISSED** with prejudice; and it is further

**ORDERED** that plaintiff's claim for denial of access to the courts is **DISMISSED** without prejudice; and it is further

**ORDERED** that within 30 days of the date of this Memorandum–Decision and Order, plaintiff may file an Amended Complaint limited to his claim for denial of access to the courts, to plausibly suggest that he suffered an actual injury; and it is further

**ORDERED** that if plaintiff fails to file an Amended Complaint within 30 days of this Memorandum–Decision and Order, this action will be dismissed with prejudice; and it is further;

**ORDERED** that the Clerk of the Court shall serve on the parties a copy of this Memorandum–Decision and Order in accordance with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

**\*7 IT IS SO ORDERED.**

***REPORT–RECOMMENDATION and ORDER***

THÉRÉSE WILEY DANCKS, United States Magistrate Judge.

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

Honorable Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Johnathan Johnson alleges that he was deprived of paper and prevented from obtaining video evidence. (Dkt. No. 5). Plaintiff further alleges that Defendants denied him access to the courts and the inmate grievance program at Upstate Correctional Facility. *Id.* Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 2). For the reasons that follow, I recommend that Defendants' motion be granted.

**I. BACKGROUND**

Plaintiff is a frequent litigator who is barred from proceeding *in forma pauperis* in federal court absent a showing of an exception to the Prison Litigation Reform Act's "three-strikes" rule. *See Johnson v. Adams,* No. 9:10–CV–1082 (DNH/DEP), 2012 U.S. Dist. LEXIS 104723, 2012 WL 3052957 (N.D.N.Y. July 5, 2012) (recounting Plaintiff's litigation history).[FN1]

> FN1. Taking judicial notice of Plaintiff's litigation history in federal and state court is appropriate in determining this motion to dismiss. It is "well established that courts may take judicial notice of publicly available documents on a motion to dismiss." *In re DDAVP Indirect Purchaser Antitrust Litig.,* 903 F.Supp.2d 198, 208 (S.D.N.Y.2012). Under Federal Rule of Evidence 201, a court "may take judicial notice on its own" of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)-(c). A court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings, but not for the truth of the matters asserted in the other litigation. *Liberty Mutual Ins. Co. v. Rotches*

*Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992); *see also Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) ("[C]ourts routinely take judicial notice of documents filed in other courts ... to establish the fact of such litigation and related filings."). Courts also may take judicial notice of another court's order to recognize the judicial act the order represents or the litigation subject matter. *See City of Amsterdam v. Daniel Goldreyer, Ltd.,* 882 F.Supp. 1273, 1279 (E.D.N.Y.1995) (*citing United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994)).

Plaintiff filed this action in state court on April 16, 2013. (Dkt. No. 5). Plaintiff alleges Special Housing Unit Directive 4933 deprived him of video evidence for a grievance hearing and access to paper from 2007 through 2013. *Id.* at 1–3. Plaintiff alleges that Defendants David Rock, Donald Uhler, and Theodore Zerniak authorized the deprivation of video evidence and paper. *Id.* at 3–4. Plaintiff states that because he was denied access to paper, he has lost "all appeals with the Third Department of the Supreme Court of the State of New York." *Id.* at 4. Plaintiff alleges that he filed "numerous grievance complaints" regarding the issue, which Defendants denied. *Id.* at 3. Plaintiff alleges that he notified Defendant Brian Fischer about the alleged denial of access to the courts "to no avail." *Id.* at 4.

On July 2, 2014, Defendants removed the action to this Court. (Dkt. No. 1.) Plaintiff filed a motion to remand the case to state court. (Dkt. No. 7.) On December 9, 2014, the Court denied Plaintiff's motion to remand. (Dkt. No. 17.)

Defendants now seek to dismiss the complaint. (Dkt. No. 2.) Plaintiff has opposed the motion. (Dkt. No. 6.) Defendants have filed a reply. (Dkt. No. 9.)

**II. LEGAL STANDARD GOVERNING MO-**

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

**TIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a Plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*8** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

**III. ANALYSIS**

**A. Personal Involvement**

Plaintiff alleges that Defendants David Rock, Theodore Zerniak, and David Uhler authorized the denial of grievance video tapes and the paper deprivation order that form the basis for this lawsuit. (Dkt. No. 5 at 3–4.) Plaintiff alleges that he filed grievances on numerous occasions about the issues raised in this lawsuit. *Id.* at 3. Plaintiff alleges that Defendants Jeff McKay, Gail Haponik, Carl Koenigsmann, Joseph Bellinier, and Maureen E. Boll were members of the Central Office Review Committee that upheld the actions of which he complains in response to his grievances. *Id.* Plaintiff alleges that he notified Defendant Brian Fischer of the alleged violations that form the basis for this lawsuit. *Id.* at 4. Defendants argue that the complaint should be dismissed because Plaintiff has not plausibly alleged the personal involvement of any Defendant. (Dkt. No. 2–1 at 2–3.) For the reasons discussed below, this argument is without merit.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a Plaintiff must show some "tangible connection" between the unlawful conduct and the Defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the Defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held positions of au-

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

thority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).[FN2]

> FN2. In *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal'* s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). The Second Circuit itself has noted that "*Iqbal* has ... engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon.*" *Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012). The Second Circuit declined to address the issue in *Reynolds,* however, and has not addressed it since that time. I will assume for the purposes of this motion that *Colon* remains good law.

**\*9** Here, several of the *Colon* categories apply. First the complaint alleges that Defendants Rock, Uhler, and Zerniak authorized the denial of grievance video tapes and the paper deprivation order. (Dkt. No. 5 at 3–4.) This plausibly suggests that these Defendants directly participated in the alleged violation. Thus, the complaint alleges facts plausibly suggesting personal involvement by Defendants Rock, Uhler, and Zerniak.

Second, the complaint alleges that Defendants McKay, Haponik, Koenigsmann, Bellinier, and Boll served on the committee that responded to grievances that Plaintiff filed about the subject matter of this lawsuit. (Dkt. No. 5 at 3.) Receiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement. *Shomo v. City of New York,* 579 F.3d 176, 184 (2d Cir.2009). However, district court decisions in this Circuit have established that

> where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable.... At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them. Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.

*Walker v. Pataro,* No. 99 CIV. 4607(GBD)(AJP), 2002 U.S. Dist. LEXIS 7067, at \*42–43, 2002 WL 664040, at \*12–13 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted) (collecting and analyzing decisions).[FN3]

> FN3. The Court will provide Plaintiff with a copy of this unpublished decision in ac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

cordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Here, the complaint alleges that Defendants McKay, Haponik, Koenigsmann, Bellinier, and Boll responded to Plaintiff's grievances. (Dkt. No. 5 at 3.) Therefore, the complaint plausibly suggests that these Defendants were personally involved in the alleged violation.

Third, the complaint alleges that Plaintiff notified Defendant Fischer about the subject matter of this lawsuit. (Dkt. No. 5 at 4.) District courts in this circuit have routinely held that a prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring" within the meaning of *Colon. Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, district courts have held that "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002). However, the Second Circuit has recently cautioned courts against dismissing claims at the 12(b)(6) stage for failure to allege personal involvement where the Plaintiff alleges that an official failed to respond to a letter of complaint. *Grullon v. City of New Haven,* 720 F.3d 133, 141 (2d Cir.2013) ("At the pleading stage, even if Grullon had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference ... that the Warden in fact received the Letter, read it, and thereby became aware of the alleged conditions of which Grullon

complained.").

**\*10** Here, under *Grullon,* Plaintiff is entitled to the inference that Defendant Fischer received his notifications, read them, and became aware of the alleged conditions of which Plaintiff complained. Therefore, the complaint plausibly suggests Defendant Fischer's personal involvement.

**B. Access to the Courts**

Plaintiff alleges that he was denied access to the courts. (Dkt. No. 5 at 2.) Defendants argue that the complaint should be dismissed because Plaintiff has not plausibly alleged that he has lost any meaningful access. (Dkt. No. 2–1 at 3–4.) Specifically, Defendants argue that the record indicates that Plaintiff "has had plenty of access to ... the courts." *Id.* at 3. For the reasons discussed below, it is recommended that the Court grant Defendants' motion and dismiss this claim with leave to amend.

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). To state a claim for denial of access to the courts, a Plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the Plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 351–53, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff alleges that the Defendants denied

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

him access to the courts. (Dkt. No. 5 at 2.) Facts on the face of the complaint and of which the Court may take judicial notice show, however, that Plaintiff was not denied such access. As discussed above, Plaintiff filed myriad federal lawsuits during the time period in which he alleges that he was deprived of paper. Further, although Plaintiff asserts that he "has lost all appeals with the Third Department" because of the paper deprivation order (Dkt. No. 5 at 4), the public record shows that Plaintiff lost appeals in the Third Department during the relevant time period on grounds other than failure to file timely paperwork. *See, e.g., Johnson v. Dennison,* 53 A.D.3d 962, 860 N.Y.S.2d 758 (N.Y.App. Div.3d Dep't 2008) (dismissing appeal regarding April 2006 parole decision as moot in light of later decision by the Board of Parole). The record also shows that Plaintiff was a frequent litigant in the Second Department during the relevant time period. *See, e.g., People v. Johnson,* 101 A.D.3d 750, 954 N.Y.S.2d 487 (N.Y.App. Div.2d Dep't 2013); *People v. Johnson,* 58 A.D.3d 643, 869 N.Y.S.2d 911 (N.Y.App. Div.2d Dep't 2009). Therefore, Plaintiff has not pleaded an actual injury and the claim should be dismissed.

**\*11** Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* Here, there is a possibility, however slim, that Plaintiff could amend the complaint to allege facts plausibly suggesting that he suffered an actual injury. Therefore, I recommend that the Court dismiss this claim with leave to amend.

**C. Denial of Evidence and Access to Inmate Grievance Procedure**

Plaintiff alleges that he was denied "grievance video tapes " and denied access to grievance procedures. (No. 5 at 4.) Defendants move to dismiss this claim, arguing that inmates have no protected interest in grievance proceedings. (Dkt. No. 2–1 at 4–5.) Defendants are correct. "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do [ ] not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–370 (W.D.N.Y.2005). Therefore, I recommend that the Court dismiss this claim without leave to amend.

Because I have determined that Plaintiff's complaint is subject to dismissal on the constitutional merits, I decline at this time to address Defendants' argument that any allegations concerning events before April 16, 2010, are time-barred. (Dkt. No. 2–1 at 5.)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 2) be **GRANTED.** It is recommended that Plaintiff be granted leave to amend his claim regarding access to the courts, but denied leave to amend his claims regarding access to the grievance program; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Walker v. Pataro,* No. 99 CIV. 4607, 2002 U.S. Dist. LEXIS 7067, 2002 WL 664040 (S.D.N.Y. Apr.23, 2002).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1735102 (N.D.N.Y.)
**(Cite as: 2015 WL 1735102 (N.D.N.Y.))**

***REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b) (1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2015.
Johnson v. McKay
Slip Copy, 2015 WL 1735102 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Andre SMITH, Plaintiff,
v.
THE CITY OF NEW YORK, Captain Kennedy # 425,
Corrections Officer Bennett # 12929, Warden Mark
Farsi, Defendants.

No. 03 Civ. 7576(NRB).
May 3, 2005.

Andre Smith, Southport Correctional Facility, Pine
City, NY, Plaintiff pro se.

Michael Chestnov, Assistant Corporation Counsel,
New York, NY, for Defendants.

MEMORANDUM AND ORDER
BUCHWALD, J.

**\*1** Plaintiff Andre Smith, presently incarcerated
at the Southport Correctional Facility in Pine City,
New York, brings this action *pro se* under 42 U.S.C. §
1983 against the City of New York, Captain Anthony
Kennedy ("Captain Kennedy"), Corrections Officer
Dwayne Bennett ("C.O.Bennett"), and Warden Mark
Farsi ("Warden Farsi"). Plaintiff claims that defend-
ants destroyed his personal property and legal papers
in retaliation for his filing a federal lawsuit against
another corrections officer, thereby interfering with
his right of access to the courts and depriving him of
his property without due process. Plaintiff brings suit
under 42 U.S.C. § 1983 seeking compensatory and
punitive damages for violations of his First, Fourth,
and Fourteenth Amendments constitutional rights.

Plaintiff filed his initial complaint against de-
fendants on July 11, 2003, and an amended complaint
("Am.Compl.") on September 28, 2003. On October
20, 2004, defendants moved for summary judgment
pursuant to Fed.R.Civ.P. 56. For the reasons discussed
below, defendants' motion is granted in part and de-
nied in part.

BACKGROUND [FN1]

FN1. This factual statement is based on the
plaintiff's amended complaint and deposition
testimony except where noted.

At all times relevant to this complaint, plaintiff
was incarcerated in the Central Punitive Segregation
Unit at the Otis Bantum Correction Center on Rikers
Island. On the morning of July 8, 2003, plaintiff left
Rikers Island for arraignment in a criminal proceed-
ing. *See* Pl.'s Dep. at 86. When he returned to his
housing area ("2-South") at approximately 6:00 p.m.,
plaintiff's cell and locker were open and C.O. Bennett
informed plaintiff that his property had been moved
from Cell 14 to Cell 15. *Id.* at 91, 93. Plaintiff claims
that prison regulations required him to be present
when his property was moved. When plaintiff asked
why his property was taken, C.O. Bennett replied with
something to the effect of, "I don't like you, I'm pretty
sure you know why." *Id.* at 94-95.

After learning that C.O. Bennett had moved his
belongings, plaintiff demanded to speak with Captain
Kennedy, C.O. Bennett's supervisor. When Captain
Kennedy arrived, he allegedly told plaintiff "things
happen, this is our house." Am. Compl. ¶ 19.[FN2]
Eventually, plaintiff requested to see the property
removed from his cell and locker. Pl.'s Dep. at 113-14.
When C.O. Bennett retrieved plaintiff's property,
several items were missing. *Id.* at 118. In addition to
approximately nine hundred dollars worth of personal

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

property, [FN3] plaintiff was missing a substantial amount of his legal materials from his cell and locker. Am. Compl. ¶¶ 15-16.

> FN2. At his deposition, however, plaintiff testified that Captain Kennedy stated that he did not know where plaintiff's belongings were because C.O. Bennett had packed them. Pl.'s Dep. at 132.

> FN3. The missing personal property included personal photographs, hygiene products, clothing, books and magazines. *See id.* at 192-93.

At the time of the incident, plaintiff had one criminal case [FN4] and two civil lawsuits pending in this district. Both of plaintiff's civil lawsuits involved incidents at plaintiff's prison facility, and both named Rikers Island corrections officers as defendants.[FN5] One of plaintiff's cases named a corrections officer Jordan ("C.O.Jordan"), another corrections officer assigned to plaintiff's housing unit, as a defendant. Plaintiff's complaint alleges that C.O. Jordan and C.O. Bennett are friends from working together in 2-South, and that C.O. Bennett's actions were in retaliation for plaintiff naming C.O. Jordan in the lawsuit. All of the corrections officers named by plaintiff in his two lawsuits were served copies of plaintiff's complaints by U.S. Marshals on July 8, 2003, the date of the current incident.[FN6]

> FN4. It is unclear from the record where the criminal case against plaintiff was filed.

> FN5. Plaintiff's lawsuits concerned an alleged assault by a corrections officer, and an earlier incident of destruction of plaintiff's property by corrections officers. *See Smith v. Benston, et al.,* No. 03 Civ 3979(MBM) (S.D.N.Y. filed June 2, 2003)("No. 03 Civ 3979"); *Smith v. Robertson,* No. 03 Civ.

3989(KMW) (S.D.N.Y. Oct. 16, 2003)(order dismissing the action with prejudice due to settlement) ("No. 03 Civ 3989").

> FN6. While it does not appear that the individual defendants were served directly by U.S. Marshals, other corrections officers at Rikers Island accepted service on their behalf on the morning of July 8, 2003. Defs.' Exs. C, D.

**\*2** The specific legal materials allegedly destroyed varied for each case. In his criminal case, plaintiff lost his copies of numerous motions drafted by his lawyer, along with his copy of his grand jury minutes. Pl.'s Dep. at 119. Through his lawyer, plaintiff was able to secure replacement copies of the legal documents within approximately three weeks, well before the case went to trial in November of 2003. *Id.* at 120, 204-05.

In the two civil cases, both filed on June 2, 2003, the plaintiff lost his complaints, docket sheets, a *pro se* book, a jailhouse lawyer's manual, and different motions that he was "supposed to be looking over and studying because [he] was pro se." *Id.* at 121. In one case, No. 03 Civ. 3989, plaintiff was able to replace the destroyed documents within one week, but plaintiff complains that "instead of [the parties] settling the case at a specific time, [they] had to wait." *Id.* at 123-24. In the other case, No. 03 Civ. 3979, plaintiff allegedly lost copies of various documents sent by defendants' counsel. *See id.* at 124. Plaintiff does not elaborate how the loss has impacted that case, and concedes that he is not certain that he even possessed these documents on July 8, 2003, the date of the alleged incident. *See id.* at 128. As of the date of this opinion, case No. 03 Civ. 3979 remains pending before Chief Judge Mukasey.

DISCUSSION

Between his complaint and deposition testimony,

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

plaintiff has alleged three constitutional claims under § 1983:(1) retaliation for the exercise of a constitutionally protected right; (2) denial of access to the courts; and (3) deprivation of property without due process.[FN7] These claims are discussed in turn below.

> FN7. To the extent plaintiff makes a claim for violation of his Fourth Amendment rights, plaintiff's claim fails because he does not have a right to be free from searches and seizures of the property in his cell. *See Hudson v. Palmer,* 468 U.S. 517, 525-27, 528 n. 8 (1984) (; *Bell v. Wolfish,* 441 U.S. 520, 537 (1979)* ("Loss of freedom of choice and privacy are inherent incidents of confinement...."); *Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002).

## I. Standard for Summary Judgment

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Frito-Lay, Inc. v. LTV Steel Co. ( In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993).

In order to defeat such a motion, the nonmoving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (internal quotation marks omitted). In addition, when deciding a motion for summary judgment, a district court may only consider evidence that would be admissible at trial. *See Nora Beverages v. Perrier Group of America, Inc.,* 269 F.3d 114, 123 (2d Cir.2001).

## II. First Amendment Retaliation

**\*3** Plaintiff alleges that the defendants deprived him of property in retaliation for his filing federal lawsuits against other corrections officers at Rikers Island. Such actions are prohibited under the Constitution because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993).

Courts approach such retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To survive summary judgment, a plaintiff alleging retaliation must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes,* 239 F.3d at 492. *See also Winthrow v. Donnelly,* 356 F.Supp.2d 273, 275 (W.D.N.Y.2005) (applying *Dawes* standard to summary judgment motion); *Contes v.. Porr,* 345 F.Supp.2d 372, 377-78 (S.D.N.Y.2004) (same). Since access to the courts is an established constitutional right, *Bounds v. Smith,* 430 U.S. 817, 821 (1977), we turn to the second and third prongs of the retaliation test.

Adverse action is conduct "that would deter a

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493. What constitutes adverse action is context specific, and "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before [retaliatory] action taken against them is considered adverse." *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999). *De minimis* acts of retaliation do not chill the exercise of constitutional rights, and thus are insufficient to support a First Amendment retaliation claim. *See Davidson v. Chestnut,* 193 F .3d 144, 150-51 (2d Cir.1999).

The adverse action alleged by plaintiff involves the destruction of his legal papers and his personal property. This action was specifically directed against plaintiff, was in violation of prison regulations, and deprived him of a substantial amount of personal property. Such retaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action. *See Soto v. Iacavino,* No. 01 Civ. 5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003). In addition, the retaliatory conduct alleged here involves more than just the destruction of personal property. Instead, the conduct appears designed specifically to deter plaintiff's exercise of his constitutional rights through the destruction of his legal papers. Accordingly, we find that plaintiff has established an adverse action substantial enough to satisfy the second prong of the retaliation test. *See Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002).

**\*4** For the third prong, plaintiff must establish a casual connection between the filing of his lawsuits and the retaliatory event. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' [in the adverse action]." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. NYC Health & Hosps. Corps.,* 940 F.2d 775, 780-81 (2d Cir.1991). With respect to C.O. Bennett, plaintiff has provided direct

evidence of the connection between the two events as well as a temporal connection. First, plaintiff alleges that C.O. Bennett's statement "I don't like you, I'm pretty sure you know why" is evidence that plaintiff's property was destroyed because of his lawsuit against C.O. Bennett's co-worker, C.O. Jordan. Taken alone, this statement might not provide sufficient evidence to survive summary judgment, as C.O. Bennett has provided an affidavit that he had no knowledge of plaintiff's lawsuit against Officer Jordan. *See* Defs.' Notice of Motion for Summ. J., Ex. F (Aff. of Dwayne Bennett). However, when this alleged statement is combined with circumstantial evidence regarding the timing of the incident, plaintiff has established genuine issues of material fact regarding the reason for the destruction of his property. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995) ("In light of the combination of circumstantial and direct evidence of retaliation that [plaintiff] presents, we conclude that his claim, however valid it may ultimately prove to be, is sufficiently strong to defeat the motion for summary judgment.").

First, plaintiff has established that his property was destroyed on the very same day that the other Rikers Island corrections officers were served with the plaintiff's complaints in his civil suits. Defs.' Ex. C, D.[FN8] Although plaintiff had filed his lawsuits in early June, it is quite likely that July 8, 2003, is the first date that the individual corrections officers learned they had been named in plaintiff's lawsuits. Second, plaintiff alleges that C .O. Jordan had been working in 2-South immediately prior to C.O. Bennett's shift on the day of the incident, providing C.O. Jordan with an opportunity to discuss with C.O. Bennett plaintiff's lawsuits. Pl.'s Dep. at 95. In light of this highly suspicious timing and C.O. Bennett's alleged statement, a reasonable jury could find a causal connection between the destruction of plaintiff's property and plaintiff's protected action. Accordingly, defendants' motion for summary judgment on the retaliation claim is denied as to C.O. Bennett.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN8. While a U.S. Marshal did not directly serve C.O. Jordan, the proof of service filed by plaintiff establishes that another corrections officer at Rikers Island, C.O. Houston, accepted service on C.O. Jordan's behalf on the morning of July 8, 2003.

With respect to the other named individual defendants, Captain Kennedy and Warden Farsi, plaintiff must establish their personal involvement in the retaliation in order to sustain a claim under section 1983. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The Second Circuit has described the personal involvement of a supervisory defendant that is required to sustain a claim under section 1983:

**\*5** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Plaintiff does not claim either defendant actually destroyed his property. Instead, plaintiff cites two statements by Captain Kennedy and Warden Farsi as evidence of their complicity in the retaliatory action, implying either that they directly ordered the retaliation, or at least were aware of it and failed to act as C.O. Bennett committed the constitutional violation. With respect to Captain Kennedy, plaintiff alleges in his complaint that Captain Kennedy told him "things

happen, this is our house" after the incident. Am. Compl. ¶ 19. During his deposition, plaintiff further argued that "[Captain Kennedy] is a supervisor, he had-has to know everything that's going on," and reasoned it was "possible" that Captain Kennedy ordered the retaliation. Pl.'s Dep. at 134. As for Warden Farsi, plaintiff states that C.O. Bennett told plaintiff that Warden Farsi had said to C.O. Bennett "this inmate has been bringing too much attention to this jail. Eventually he's going to find out whose house this is." Am. Comp. ¶ 20. At his deposition, plaintiff further stated that "one of his officers is being sued; you would think that this warden would know about it." *Id.* at 163.

Plaintiff's evidence of both defendants personal involvement is minimal, and it is quite possible that plaintiff merely assumes Captain Kennedy's and Warden Farsi's involvement based on their respective positions within the prison. If so, plaintiff's claim against the defendants will ultimately be unsuccessful. *See Colon,* 58 F.3d at 874. When ruling on a summary judgment motion, however, the Court must view the evidence in the light most favorable to the nonmovant. Given the alleged statements as well as the circumstantial evidence, a reasonable jury could believe that the defendants were personally involved in the violation. Moreover, the defendants have not submitted any evidence that Captain Kennedy and Warden Farsi were not involved in the incident, failing to obtain affidavits from either regarding their alleged involvement. As we have stated before, "[t]he Court is not so sanguine about its ability to identify a plaintiff's false assertions that it will grant summary judgement to defendants who are unwilling to swear that they did not make the incriminating statements alleged." *Allah v. Greiner,* No. 03 Civ. 3789, 2004 WL 1713811, at \* 5 (S.D . N.Y. July 29, 2004).

**\*6** Accordingly, the motion for summary judgment on plaintiff's retaliation claim against Captain Kennedy and Warden Farsi is also denied. If the defendants can present the Court with affidavits or other

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

evidence refuting plaintiff's allegations, the Court will consider another summary judgment motion on these claims.

We caution plaintiff that our denial of defendants' summary judgment motion does not reflect an opinion about the ultimate merits of plaintiff's case. At trial, plaintiff will likely be faced with direct testimony from C.O. Bennett denying any knowledge of plaintiff's lawsuits, and from Captain Kennedy and Warden Farsi denying any personal involvement in the alleged retaliation. [FN9] A reasonable jury might chose to believe such testimony rather than the primarily circumstantial evidence of retaliation that plaintiff has provided so far. Unlike the present motion, plaintiff's evidence will not be viewed in its most favorable light at trial, and the burden will be on him to prove his case against the defendants. Weighed equally against defendants' evidence, plaintiff's retaliation claim might very well fail.

> FN9. Assuming that these defendants are not successful in any renewed motion for summary judgment they might make after submission of the required affidavits.

Whether or not plaintiff will be ultimately successful in convincing a jury, however, is not for this Court to decide by motion. *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir.1998) ("[S]ummary judgment may not be granted simply because the court believes the plaintiff will be unable to meet his or her burden of persuasion at trial."). Based on the current record viewed in the light most favorable to the plaintiff, a reasonable jury could find that the defendants retaliated against him for the filing of lawsuits against Rikers Island corrections officers. Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is denied.

## III. Denial of Access to the Courts

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). Prisoners must have a "reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* at 825. The active interference of prison officials in the preparation or filing of legal documents may constitute denial of access to the courts. *See Lewis v. Casey,* 518 U.S. 343, 350 (1996). However, a prisoner must show an actual injury in order to sustain a claim for denial of access to the courts. *Id.* at 349. Actual injury occurs only when "the loss of [plaintiff's] materials prejudiced his ability to pursue a legal claim." *Santiago v. N.Y.C. Dep't of Corr.,* No. 97 Civ. 9190, 2003 WL 1563773, at *5 (S.D.N.Y. Mar. 6, 2003); *see also Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Accordingly, to survive summary judgment, plaintiff must introduce evidence to establish that his ability to pursue his criminal and civil cases was hindered by the destruction of his legal papers. *See, e.g., Thomas v. Thomas,* No. 97 Civ. 4541, 2000 WL 307391, at *3 (S.D.N.Y. Mar. 23, 2000).

### A. The Criminal Case

*7 A prisoner who is represented by counsel on criminal charges suffers no actual injury to his access to the courts if he is able to present his legal claims through his attorney. *See Perez v. Metro. Corr. Ctr. Warden,* 5 F.Supp.2d 208, 211-12 (S.D.N.Y.1998); *Santiago,* 2003 WL 1563773, at *5; *Shepherd v. Fraisher,* No. 96 Civ. 3283, 1999 WL 713839, at *5 (S.D.N.Y. Sept. 14, 1999). Despite the loss of plaintiff's personal copies of his criminal papers, plaintiff's was afforded a full opportunity to pursue his criminal defense through his legal representative. Plaintiff's counsel was able to move on plaintiff's behalf and ultimately took plaintiff's case to trial in November of 2003. Pl.'s Dep. at 205. Plaintiff has not alleged that his attorney's ability to present his claims was fundamentally impeded by the loss of plaintiff's copies of the documents, just that it was an "inconvenience" to replace them. Pl.'s Dep. at 120. Accordingly, plaintiff had a reasonably adequate opportunity to present his

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

claim via counsel, and has not established any actual impact on his defense in his criminal case from the destruction of his legal documents. *Perez,* 5 F.Supp.2d at 211.

**B. The Civil Cases**

With respect to his civil cases, plaintiff has also failed to establish any actual injury from the destruction of his legal papers. First, both cases were only in their initial stages when plaintiff's legal mail was destroyed. As discussed above, plaintiff's complaints had just been served on defendants on the day of the incident. As such, it is highly unlikely in either case that there were any documents, either from the court or from defendants, that required plaintiff's response or immediate consideration when his legal papers were destroyed. Second, plaintiff was able to replace most of the documents within a relatively short period, and has articulated nothing more than minor delays from the loss of the documents. In case No. 03 Civ. 3989, plaintiff received a favorable settlement, and claims only that the case might have settled earlier if not for the destruction of the documents. Plaintiff's other case alleging assault by a corrections officer, No. 03 Civ. 3979, is still active and awaiting disposition nearly two years after the alleged incident.

The constitutional right of reasonable access to the courts is not violated by "[i]nterferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts." *Jermosen v. Coughlin,* No. 89 Civ. 1866, 1995 WL 144155, at *5 (S.D.N.Y. Mar. 30, 1995). Plaintiff has not established any injury to his legal claims from the destruction of his papers other than the alleged delays. Accordingly, there are no genuine issues of material fact regarding plaintiff's claim of denial of access to the courts, and we grant summary judgment to the defendants on this issue.

**IV. Deprivation of Property Without Due Process**

A quintessential aspect of due process is "that an individual be given an opportunity for a hearing *before*

he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)). However, when the deprivation is based upon the "random and unauthorized" act of a state employee, an adequate post-deprivation remedy is sufficient to satisfy due process. *Parratt v. Taylor,* 451 U.S. 527, 541 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327 (1986); *see also Hudson v. Palmer,* 468 U.S. 517, 533 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of procedural requirements of Due Process Clause if a meaningful postdeprivation remedy for the loss is available"); *Hellenic American Neighborhood Action Comm. v. The City of New York,* 101 F.3d 877, 880 (2d Cir.1996). In *Parratt,* the Court recognized the impracticability of providing predeprivation hearings for tortious deprivations of property as "the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Id.* Accordingly, "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing meaningful, the State satisfies its constitutional obligations by providing the latter." *Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.1984).

**\*8** However, not all unauthorized deprivations of property can be remedied by postdeprivation hearings. The Second Circuit has distinguished between the random and unauthorized acts of low-level state employees and certain unauthorized deprivations caused by high-level state officials. *Dwyer v. Regan,* 777 F.2d 825, 832-33 (2d Cir.1985). Recognizing that high-level policymakers have "final authority over the decision-making process," a high-ranking official's "ability to anticipate the actions that he intended [is] ... fairly attributable to the State itself." *Id.* at 833. As such, the acts of high-ranking officials, even if in violation of state procedures, are not "random and unauthorized" withing the meaning of *Parratt* and *Hudson.* Because the State can reasonably be expected

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

to foresee the actions of its high-ranking senior officials, due process will not be satisfied by postdeprivation remedies for their actions. *Id.*

In the instant case, it is difficult to imagine how the State could have anticipated defendants' actions, or what type of predeprivation hearing the State could have provided plaintiff. Moreover, plaintiff has offered no evidence that the actions was anything other than "random and unauthorized" within the meaning of both *Parratt* and *Hudson.* Even assuming *arguendo* that Captain Kennedy and Warden Farsi were somehow involved in the deprivation, they are not the type of high-level policymakers whose actions are fully attributable to the State. *Mejia v. New York City Dep't of Corr.,* No. 96 Civ 2396, 1999 WL 138306, at *2 (E.D.N .Y. Mar. 5, 1999)* (assistant warden and captain named in action do not qualify as policymakers). Accordingly, the availability of postdeprivation remedies is a defense to plaintiff's due process claim.

It is well established that New York provides inmates with the opportunity for a meaningful post-deprivation hearing by way of state law causes of action for "negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss ." *Cook v. City of New York,* 607 F.Supp. 702, 704 (S.D.N.Y.1985)*; *see also Dove v. City of New York,* No. 99 Civ. 3020, 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000); *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995).* "[P]laintiff's failure to take advantage of the state [law] does not convert his cause of action into a constitutional due process claim." *Smith,* 901 F.Supp. at 647; *see also Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)* ("[S]ection 1983[can]not be made a vehicle for transforming mere civil tort claims into constitutional injuries.").

Because the deprivation of plaintiff's property was random and unauthorized and plaintiff had access to meaningful postdeprivation remedies, due process was not violated. As such, defendants are entitled to summary judgment on this claim.

## V. Plaintiff's Claims Against the City of New York

**\*9** In order to hold a municipality liable as a "person" under section 1983, the plaintiff must "first prove the existence of a municipal policy or custom to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection-an 'affirmative link'-between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985).

Plaintiff has failed to establish that the alleged constitutional violations were a result of any city policy or practice. Plaintiff's complaint alleges only that the city "hired unqualified people and failed to adequately train them." Am. Compl. ¶ 25. First, plaintiff has offered no evidence to show that the City of New York has a policy of hiring unqualified individuals, nor has he identified any specific deficiencies in its supervision or training of its corrections officers. *See Board of the County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 409-10 (1997)* (liability may attach if "violation of federal rights may be a highly predictable consequence of a [municipality's] failure [to train officers] ... to handle recurring situations"). Second, such a theory can only be the basis of section 1983 liability if the municipality's deficient conduct was the cause of plaintiff's injury. *See Morrissey v. City of New York,* 963 F.Supp. 270, 273-74 (S.D.N.Y.1997).* As plaintiff has not established that any "identified deficiency in a city's [training or hiring] program" caused the his injury, *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989),* we grant the defendants' motion for summary judgment on all of plaintiff's claim against the City of New York.

## CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment is denied with respect to the plaintiff's First Amendment retaliation claim against C.O. Bennett, Captain Kennedy, and Warden

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

Farsi, and granted with respect to the other claims against the individual defendants, and granted with respect to all claims against the City of New York.

IT IS SO ORDERED.

S.D.N.Y.,2005.
Smith v. City of New York
Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.